## NATIONAL LABOR RELATIONS BOARD
### v. HOPPES MFG. CO.
#### No. 10618.

United States Court of Appeals
Sixth Circuit.
Nov. 29, 1948.

Wm. O. Murdock, of Washington, D. C. (David P. Findling and Ruth Weyand, both of Washington, D. C., and Samuel M. Kaynard, of New York City, on the brief), for petitioner.

John M. Cole, of Springfield, Ohio (John M. Cole, of Springfield, Ohio, on the brief), for respondent.

Before HICKS, Chief Judge, and ALLEN and MILLER, Circuit Judges.

ALLEN, Circuit Judge.

In this case the National Labor Relations Board asks for enforcement of its order

finding the respondent had restrained and coerced its employees in violation of § 7 of the National Labor Relations Act and had refused to bargain collectively as required by § 8(5) of the same statute, 29 U. S.C. § 157 and § 158, 29 U.S.C.A. §§ 157, 158.

The case presents primarily a question of fact. It arises out of the following circumstances, which for the most part are not controverted.

The controlling interest in respondent was owned by John W. Hoppes, who prior to his death in 1945 was heavily indebted to a local bank. In order partly to protect the bank's loan, H. E. Freeman, president of the bank, and B. A. Mayer, president of the Bundy Incubator Company, and also director of the bank, on August 27, 1945, purchased the entire block of Hoppes' stock. Mayer's principal interest in the matter was to acquire the plant building as a storehouse for the Bundy Incubator Company. Freeman and Mayer intended at first to close the business, but later, at the intercession of Forrest R. White, general manager of respondent, they decided to operate it experimentally for about a year. The business had never paid dividends; it had broken even since 1941.

The plant, which makes feed water heaters, at the time employed eleven men. Shortly before Freeman and Mayer purchased the stock, a consent election had been held at which the U. A. W.—C. I. O. had been chosen as bargaining representative, but Freeman and Mayer were not aware of this circumstance until about a week after they started to operate the business.

The new set-up was not particularly well organized. Freeman had nothing to do with the management, which he left to Mayer and White. He said frankly to one of the United States conciliators that he was "thoroughly indifferent to the operation of the plant" other than his natural reluctance to drop some men where they had worked for many years.

Mayer was absent during some four weeks of the critical phase of the controversy. He had rented a quarter of the plant building for warehouse space and thus had attained his main purpose in buying a share in the business. While Mayer primarily represented the owners in the management, he gave no instructions to White as to how to deal with the union and, due to his absence from the city, he at no time met with the United States conciliator.

The Board found that shortly after Freeman and Mayer took over the business, statements were made by both the superintendent and the manager to the effect that the plant would be closed if the union came in. This finding is conclusively supported by the record. The factory superintendent told two of the men that there had been a change of ownership and that "as far as the Union was concerned, it wouldn't tolerate it. * * *" He further said that if the employees would not give up the union he would have to close the plant.

Richardson, an employee, testified that White, the manager, told the men in a general meeting that "the place had changed hands, and that he thought that Mr. Mayer would be a man that would be glad to meet us all squarely, and told us at that time he didn't think that the Union would be a necessary thing for the employees there at the plant, and he did say, too, that Mr. Mayer would not have the Union in the plant." In answer to a question as to what would happen if the employees persisted in their desire to have a union, White said the company "would have to close it down."

■ The respondent does not seriously controvert these statements, but points out that the company had never operated at a profit, contends that it was the right of Mayer and Freeman to discontinue operations at any time, and that the declaration that the plant would be closed therefore did not constitute an unfair labor practice. But the statements quoted were more than a mere notice of discontinuance due to financial failure. They constituted a threat to discontinue unless the union was dispensed with, and this was clearly coercive under the statute.

964

While Freeman and Mayer were confronted with an unexpected situation and they personally did not oppose the union, they authorized White to represent them in the negotiations with the union, and they are bound by his acts. The change of ownership in no way affects the obligation of the employer under the statute. "It is the employing industry that is sought to be regulated and brought within the corrective and remedial provisions of the Act in the interest of industrial peace." National Labor Relations Board v. Colten, 6 Cir., 105 F.2d 179, 183. Cf. National Labor Relations Board v. Blair Quarries, Inc., 4 Cir., 152 F.2d 25; National Labor Relations Board v. Adel Clay Products Co., 8 Cir., 134 F.2d 342, 346; National Labor Relations Board v. Baldwin Locomotive Works, 3 Cir., 128 F.2d 39, 43; Bethlehem Steel Co. v. National Labor Relations Board, 74 App.D.C. 52, 120 F.2d 641, 650.

As to the refusal to bargain, a similar conclusion is required. At the one meeting between the union representatives and White on June 7, 1946, White listened in silence to the reading of the proposed contract which had already been delivered to him, until the section dealing with wages was reached. He then declared in effect that no increase in wages was possible and that if that was the principal issue, the negotiations might as well close. He said that he would not bargain with outsiders, referring to the union agent, and after the meeting had broken up, engaged in a personal controversy with Patton, union representative, so acrimonious that Mayer and Freeman relieved White of authority to deal with the union. Within some five weeks the positions in the plant were reclassified and substantial raises given. Mayer and Freeman both said they did not consider it necessary to notify the union of these raises, either when proposed or when put into effect, and thus admitted ignoring the union. This was a violation of § 8(1) and § 8(5) of the Act. May Department Stores Co. v. National Labor Relations Board, 326 U.S. 376, 383, 384, 66 S.Ct. 203, 90 L.Ed. 145; National Labor Relations Board v. Elyria Telephone Co., 6 Cir., 158 F.2d 868, 872.

It is evident that the impasse here resulted not from a genuine attempt to bargain in good faith, as was the case in National Labor Relations Board v. Sands Mfg. Co., 306 U.S. 332, 59 S.Ct. 508, 83 L.Ed. 682, relied upon by the respondent, but from an intentional refusal to bargain with the men's chosen representatives.

Whether the case be considered as governed by the original National Labor Relations Act of 1935, 29 U.S.C. § 151 et seq., 29 U.S.C.A. § 151 et seq., or by the Labor Management Relations Act, enacted June 23, 1947, 29 U.S.C.App. § 141 et seq., 29 U.S.C.A. § 141 et seq., the conclusion is the same. Under either statute there is ample support for the findings of the Board.

The decree of enforcement will be entered as prayed for in the petition.