NATIONAL LABOR RELATIONS
BOARD
v.
LUNDER SHOE CORP. et al.
No. 4774.

United States Court of Appeals
First Circuit.
March 15, 1954.

A. Norman Somers, Asst. General Counsel, Washington, D. C. (George J. Bott, General Counsel, David P. Findling, Associate General Counsel, and Bernard Dunau, Samuel M. Singer, and Wiley M. Craft, Washington, D. C., Attorneys on brief), for petitioner.

Benjamin E. Gordon, Boston, Mass. (Gordon & Epstein, Boston, Mass., on brief), for respondents.

Before MAGRUDER, Chief Judge, and WOODBURY and HARTIGAN, Circuit Judges.

HARTIGAN, Circuit Judge.

The National Labor Relations Board pursuant to Section 10(e) of the National Labor Relations Act, as amended, 61 Stat. 136, 29 U.S.C.A. § 151 et seq., has petitioned this court for enforcement of its order against respondents Lunder Shoe Corp., d.b.a. Bruce Shoe Co. (hereinafter called Lunder), and Bruce Shoe Co., Inc. (hereinafter called Bruce). We have jurisdiction under § 10(e) of the Act.

On March 26, 1952 the United Shoe Workers of America, C.I.O. (hereinafter called the Union) filed charges of unfair labor practices against respondent Lunder. On August 12, 1952, a second amended charge was filed by the Union against respondents Lunder and Bruce. After the usual proceedings the Board affirmed the finding of the Trial Examiner that respondent Lunder, on, and after October 11, 1951, refused to bargain with the Union in good faith and thereby interfered with, restrained and coerced its employees in the exercise of the rights guaranteed by Section 7 of the Act, in violation of Section 8(a)(5) and (1) of the Act. The Board, however, reversed the Trial Examiner's finding that respondent Bruce violated Section 8(a)(5) and (1), but found that Bruce, as well as Lunder, is responsible for remedying the unfair labor practices committed by Lunder. Respondents now contend that (1) the Board's findings with respect to respondent Lunder are not supported by substantial evidence on the record considered as a whole and (2) the Board improperly directed its order against Bruce.

Prior to the time of the alleged unfair labor practices, Mitchell Shoe Company (hereinafter called Mitchell) was engaged in the manufacture and sale of women's shoes at a plant in Biddeford, Maine. On October 19, 1950, following a consent election in which 136 employees voted in favor of the Union and 33 voted against it, the Union was certified by the Board as the bargaining representative of Mitchell's production and maintenance employees. Thereafter, Julian Weinstein, general manager of Mitchell, and the Union began contract negotiations. The Union submitted a contract to Weinstein sometime in February of 1951, but it was never signed by Mitchell. On March 15, 1951, 98 employees voted in favor of authorizing the Union to enter into an agreement with the employer which required membership in the Union as a condition of con·

tinued employment and 14 employees voted against this proposition. On June 29, 1951, Mitchell assigned its lease of the Biddeford plant and sold all its machinery, equipment and personal property at the plant to Lunder for $69,699. Mitchell retained the right to finish any shoes it was processing at the time of the sale.

Lunder, a New Hampshire corporation, has its principal place of business in Dover, New Hampshire, where it is engaged in the manufacture, sale, and distribution of shoes. Michael Lunder is its President and Treasurer. Michael Lunder's objective in purchasing the Biddeford plant was to acquire a shoe business for his son, Bruce Lunder. Prior to the purchase of the Biddeford plant, Michael Lunder had asked Sidney Spiegel, a man with eighteen years of experience in the shoe business, to buy Mitchell's business in association with Bruce Lunder. Spiegel at that time declined to accept this proposal. During the month of July 1951 the Biddeford plant operated on a reduced scale, with Mitchell completing its orders and Lunder beginning the initial stages of its shoe production. By September 1, 1951, Lunder employed a complete production and maintenance force at the Biddeford plant and conducted the business under the name "Bruce Shoe Company". In February 1952 Michael Lunder again asked Spiegel to take over the Biddeford plant operations in association with his son, Bruce Lunder. On March 1, 1952 Spiegel, Michael Lunder and Bruce Lunder agreed that Spiegel and Bruce Lunder would form a corporation which would purchase the Biddeford plant business from Lunder for $100,000. Pending the payment of the purchase price and the execution of incorporation papers, it was agreed that legal title to the business would remain in Lunder. The profits or losses of the business from March 1, 1952 accrued to Bruce Lunder and Spiegel. On July 12, 1952, the incorporation papers of respondent Bruce were filed with the Secretary of State of Maine. All the stock of respondent Bruce is owned by Bruce Lunder, Spiegel, and Spiegel's wife. Michael Lunder is not an officer, director or shareholder of respondent Bruce.

The Board found that Lunder first refused to bargain with the Union in good faith on October 11, 1951. Lunder contends that there is insufficient evidence of the Union's majority status on that date. The Union, however, was certified by the Board as the bargaining representative for the production and maintenance employees at the Biddeford plant on October 19, 1950. In order to secure some measure of stability in bargaining relationships, the certification of a bargaining representative obliges the employer to recognize and bargain with such representative for a reasonable period. Franks Bros. Co. v. National Labor Relations Board, 1944, 321 U.S. 702, 64 S.Ct. 817, 88 L.Ed. 1020; National Labor Relations Board v. Brooks, 9 Cir., 1953, 204 F.2d 899. What constitutes a reasonable period will depend upon the facts of each individual case, but it is well established that a mere change of employers alone is not sufficient to nullify the certification of the employees' representative. National Labor Relations Board v. Blair Quarries, 4 Cir., 1945, 152 F.2d 25; National Labor Relations Board v. Hoppes Mfg. Co., 6 Cir., 1948, 170 F.2d 962. In the absence of evidence of a substantial change in the nature of the employee-employer relationship there is "no reason to believe that the employees will change their attitude merely because the identity of their employer has changed." National Labor Relations Board v. Armato, 7 Cir., 1952, 199 F.2d 800, 803. If the "employing industry" remained essentially the same after the transfer of ownership, Lunder is bound by the Union certification because it is "the employing industry that is sought to be regulated and brought within the corrective and remedial provisions of the Act in the interest of industrial peace. * * *" National Labor Relations Board v. Colten, 6 Cir., 1939, 105 F.2d 179, 183.

Lunder contends that after its purchase of the Biddeford plant from Mitchell basic changes occurred in the working force, products, machinery, operations and supervisory staff of the plant. There was testimony, however, of the following facts.

The only changes in the machinery consisted of its realignment in the cutting, stitching, and lasting rooms and the purchase of $9,000 to $10,000 worth of new machinery from July, 1951 to March, 1952. Both Mitchell and Lunder manufactured women's shoes although Lunder used the "Compo" instead of the "California" process. The majority of Mitchell's supervisors, including Weinstein who was general manager of the plant until late in October 1951, remained with Lunder for varying periods of time. Lunder had 132 employees on its payroll on September 1, 1951. Mitchell had about 250 employees at the time of the sale of the plant to Lunder. About 100 to 175 people were *rehired* when Lunder began operations. Also there was testimony that " *   *  a good substantial proportion, probably well over 50 percent of the employees who eventually went on the payroll of Bruce Shoe Company *   *   * sometime during July, had formerly worked for Mitchell *   *   *." On the basis of this evidence the Board was amply justified in finding that Lunder continued the employing industry of Mitchell without substantial change. We therefore conclude that on October 11, 1951 the Union's certification had not been in effect for an unreasonable length of time and that on that date Lunder was under a duty to recognize and bargain with the Union.

Lunder next contends that even if it were bound by the Union's certification, there is insufficient evidence of its failure to bargain with the Union in good faith. We do not agree. Section 8(d) of the Act states that " *   *   * to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times   *   *   *." In the instant case we believe there is substantial evidence on the record considered as a whole that Lunder did not perform its statutory obligation to meet with the Union.

In the latter part of July 1951, Fecteau, the regional representative for the Union, telephoned Michael Lunder. Fecteau testified that he told Lunder that the Union was the bargaining representative of the employees at the Biddeford plant; that he asked Lunder to meet with the Union for the purpose of signing the contract which had previously been negotiated with Mitchell; that Lunder had replied Julian Weinstein was still with the company and was charged with labor relations and therefore Fecteau would have to see Weinstein with respect to signing the contract. This testimony was corroborated by William Dallman. The telephone records of the New England Telephone and Telegraph Company disclosed that on October 11, 1951, Fecteau called Michael Lunder again. Fecteau testified that he then told Lunder that he had not been able to reach Weinstein; that he wanted to get together with Lunder about a contract and that Lunder still referred him to Weinstein. On January 21, 1952, Fecteau mailed a registered letter to Lunder in which Fecteau repeated the requests he had made in the prior telephone conversations. Fecteau never received a reply to this letter. On March 18, 1952, Fecteau again telephoned and spoke with Michael Lunder and for the fourth time made the same requests. Fecteau testified that he told Lunder he had been unsuccessful in his attempts to reach Weinstein; that Lunder stated that "we did not represent the employees of the company, in his opinion, because the election had been held in the Mitchell Shoe and it was now the Bruce Shoe and shortly it would be the Bruce and Spiegel Shoe Company, and therefore, he felt we did not represent the majority—he didn't mention 'the majority'—did not represent the workers in that factory, and he

did not feel as though he wanted to negotiate with us." Immediately after this conversation, Fecteau sent a second registered letter to the "Bruce Shoe Company" at Biddeford, Maine, but received no reply. Employees of Lunder signed return receipts for this letter and the January 21 letter. Michael Lunder recalled two of the telephone conversations, but testified that Fecteau only asked him about "the factory". He also testified that he never received the letter of January 21. The credibility of witnesses is for the Board's determination, National Labor Relations Board v. Kobritz, 1 Cir., 1951, 193 F.2d 8; Joy Silk Mills v. National Labor Relations Board, 1950, 87 U.S.App.D.C. 360, 185 F.2d 732, certiorari denied 1951, 341 U.S. 914, 71 S.Ct. 734, 95 L.Ed. 1350; and it chose to believe Fecteau.

■ The employer is obliged to bargain with the certified representative of the employees upon request. National Labor Relations Board v. Columbian Enameling & Stamping Co., 1939, 306 U.S. 292, 59 S.Ct. 501, 83 L.Ed. 660; National Labor Relations Board v. United States Cold Storage Corp., 5 Cir., 1953, 203 F.2d 924, certiorari denied 1953, 346 U.S. 818, 74 S.Ct. 30; Joy Silk Mills v. National Labor Relations Board, supra. In the instant case, the Union requested a bargaining conference on five separate occasions over a period of nearly 9 months, but it was never able to get Lunder to agree to meet. The Union also offered to bargain upon the basis of the contract it had previously submitted to Weinstein. Lunder therefore " * * was bound to make the next move." M. H. Ritzwoller Co. v. National Labor Relations Board, 7 Cir., 1940, 114 F.2d 432, 436. Admittedly the telephone conversation of July, 1951 occurred more than six months before the charges were filed by the Union, and therefore by § 10(b) of the Act could not of itself constitute a basis for the issuance of a complaint. Also the telephone conversations of July, 1951 and October, 1951 did not by themselves indicate a refusal to bargain. In late October, however, Lunder discharged Weinstein without notifying the Union and Lunder later completely ignored the Union's requests for a bargaining conference. See National Labor Relations Board v. Somerset Shoe Co., 1 Cir., 1940, 111 F.2d 681, 688; National Labor Relations Board v. Wm. Tehel Bottling Co., 8 Cir., 1942, 129 F.2d 250, 254. From the totality of Lunder's conduct, therefore, the Board was amply justified in affirming the Trial Examiner's conclusion that "Michael Lunder adopted his extended course of fending off Fecteau not because of any good faith doubt respecting the status of the Union, but for the purpose of avoiding the assumption of those obligations which the Act prescribes, and that his conduct was in disparagement of the collective bargaining process."

■■ We believe that the Board improperly directed its order against respondent Bruce. The Board ordered that the complaint insofar as it alleges that respondent Bruce engaged in, and is engaging in, unfair labor practices be dismissed. Section 10(c) of the Act states " * * * If * * * the Board shall be of the opinion that any person named in the complaint has engaged in or is engaging in any such unfair labor practice, then the Board * * * shall issue * * * an order requiring such person to cease and desist from such unfair labor practice, * * *." The issuance of the Board's order against a person is therefore conditioned upon the Board finding that such person has committed an unfair labor practice. National Labor Relations Board v. West Kentucky Coal Co., 6 Cir., 1940, 116 F.2d 816. In National Labor Relations Board v. Express Pub. Co., 1941, 312 U.S. 426 at pages 436, 437, 61 S.Ct. 693, at page 700, 85 L.Ed. 930, the court said: " * * * The breadth of the order, like the injunction of a court, must depend upon the circumstances of each case, the purpose being to prevent violations, the threat of which in the future is indicated because of their similarity or relation to those

unlawful acts which the Board has found to have been committed by the employer in the past." Since the Board has found that Bruce has committed no unlawful acts whatsoever in the past, there is no reason to anticipate it will commit any in the future.

The Board contends that its remedial order may run against both the employer guilty of the unfair labor practice and his successors and assigns. In Regal Knitwear Co. v. National Labor Relations Board, 1945, 324 U.S. 9, 65 S.Ct. 478, 479, 89 L.Ed. 661, the court held that whether or not one subjects himself to contempt under Rule 65 of the Federal Rules of Civil Procedure, 28 U.S.C.A., as a "successor or assign" in an enforcement order depends upon an appraisal of his relations and behavior with his predecessor. If Bruce is "merely a disguised continuance" of Lunder, Southport Petroleum Co. v. National Labor Relations Board, 1942, 315 U.S. 100, 106, 62 S.Ct. 452, 86 L.Ed. 718, the Board could properly direct its order against Bruce. See National Labor Relations Board v. Baldwin Locomotive Works, 3 Cir., 1942, 128 F.2d 39; National Labor Relations Board v. O'Keefe & Merritt Mfg. Co., 9 Cir., 1949, 178 F.2d 445. There is no evidence, however, that Lunder has any ownership interest in or managerial control of Bruce. Nor is there any evidence that Bruce actively concerted or participated with Lunder in order to evade an order of the Board. See National Labor Relations Board v. Birdsall-Stockdale Motor Co., 10 Cir., 1953, 208 F.2d 234. On the contrary the record clearly reveals that Lunder purchased the Biddeford plant from Mitchell and subsequently sold it to Bruce in order that, as we have indicated above, Michael Lunder's son Bruce Lunder might engage in the shoe business.

We have considered the respondents' remaining contentions and find them to be without merit.

The Board will submit for our consideration a decree in conformity with this opinion.