OVERNITE TRANSPORTATION COM-
PANY, Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

Chauffeurs, Teamsters and Helpers, Un-
ion No. 171, Intervenor.

TEAMSTERS LOCAL UNION NO. 171,
affiliated with the International Broth-
erhood of Teamsters, Chauffeurs, Ware-
housemen and Helpers of America, Pe-
titioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

Nos. 10570, 10617.

United States Court of Appeals
Fourth Circuit.

Argued Nov. 4, 1966.

Decided Feb. 6, 1967.

J. W. Alexander, Jr., Charlotte, N. C. (Ernest W. Machen, Jr., and Blakeney, Alexander & Machen, Charlotte, N. C., on brief), for petitioner Overnite Transp. Co.

Hugh J. Beins, Washington, D. C., (Michael F. Grdina, Willoughby, Ohio, on brief), for petitioner Teamsters Local Union No. 171.

Gary Green, Atty., N. L. R. B. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Frank H. Itkin, Atty., N. L. R. B., on brief), for respondent.

Before BRYAN, BELL and CRAVEN, Circuit Judges.

CRAVEN, Circuit Judge.

On November 19, 1964, Overnite Transportation Company bought, with approval of the Interstate Commerce Commission,[1] certain operating franchises and physical assets of Rutherford Freight Lines, Inc. Both before and after take-over, the Union[2] was the exclusive bargaining agent for thirty employees in units at Roanoke and Pulaski, Virginia. Without affording the Union an opportunity to discuss and bargain with respect to changes in rates of pay and

---

1. Overnite Transportation Co.—Purchase —Rutherford Freight Lines, Inc., 97 M.C.C. 568 (1964), sustained sub nom. American Buslines, Inc. v. United States, 253 F.Supp. 481 (D.D.C.), aff'd, sub nom. Amalgamated Transit Union AFL-CIO v. United States, 385 U.S. 38, 87 S.Ct. 240, 17 L.Ed.2d 35 (1966) (per curiam.)

2. Chauffeurs, Teamsters, and Helpers Local Union No. 171, affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen, and Helpers of America.

other conditions of employment, Overnite immediately (the day of take-over) put into effect its own scale of wages and other benefits then prevailing throughout the Overnite system. The result was to reduce the wages of the former Rutherford employees at Pulaski and Roanoke from $3.05 per hour to $2.60 per hour and to eliminate other more favorable terms and conditions of employment.

There is presented for our decision this question: May the Board lawfully direct Overnite to restore to employees who formerly worked for the selling company the economic benefits that had been maintained by the seller and incorporated in its contract with the Union, notwithstanding that the contract had expired before the sale, and that the purchaser, Overnite, had made known in advance and consistently its unwillingness to maintain such level of employee benefits? We think so on the facts of this case.

The case is before the court upon Overnite's petition to review and set aside the order of the Board, and upon the Board's cross-petition to enforce the order. The Union has intervened in case No. 10,570 and has itself filed a petition in No. 10,-617 to review and modify certain portions of the Board's order.

## I.

 The Union's petition and intervention presents the only fact question sought to be reviewed.[3] The Union insists that the labor contract was in effect between Rutherford and the Union on the date of take-over, November 19, 1964. The Trial Examiner and Board found otherwise, holding that the contract expired on August 31, 1964. The Union concedes in its brief that Rutherford "did terminate the contract by letter dated August 27, 1964," but insists that Rutherford agreed to continue the contract in effect as long as it (Rutherford) remained in operation. Our examination of the record discloses that there was imprecise testimony by the president and

business representative of Local 171 of the Union to that effect. But his testimony was persuasively contradicted by a letter dated October 28, 1964, to the president of the Local and signed by the president of Rutherford containing the following: "What you say about extension of the old contract is not exactly accurate. What I actually said was that if we continue to operate as Rutherford Freight Lines, Inc., we will not make changes in the rates of pay or insurance coverage before meeting with you again." Credibility and the weighing of evidence is for the Trial Examiner and the Board. Considering the record as a whole, the finding of the Board that the labor contract had expired prior to take-over by Overnite is supported by substantial evidence and will not be disturbed. Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

## II.

Overnite earnestly urges upon us its own sophisticated version of familiar and traditional common law principles. Compare United Steelworkers of America v. Reliance Universal, Inc., 335 F.2d 891 (3rd Cir. 1964). We agree (indeed, it is not contended otherwise) that Overnite did not voluntarily assume its predecessor's labor obligations when it acquired the business. The obligation of Overnite does not rest upon contract principles.

On March 30, 1964, about six months before Overnite bought out Rutherford, the Supreme Court decided John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964). In that case the Court concluded that "in appropriate circumstances" certain obligations may be imposed upon a new owner of a business by reason of the collective bargaining contract of the preceding owner.

 Our case does not come squarely within *Wiley* because the Rutherford collective bargaining contract had expired

---

3. At the hearing before the Trial Examiner, counsel for the Labor Board and counsel for Overnite agreed that there

was no dispute over the facts and that the case poses a legal question.

prior to take-over.[4] But what was said in *Wiley* is not irrelevant: "The objectives of national labor policy, reflected in established principles of federal law, require that the rightful prerogative of owners independently to rearrange their businesses and even eliminate themselves as employers be balanced by some protection to the employees from a sudden change in the employment relationship." Wiley, supra, 376 U.S. at 549, 84 S.Ct. at 914.

In *Wiley*, the "new" employer was held bound by one of the terms of a collective bargaining contract to which he had never agreed. *Wiley* reaches beyond the Board's order in this case and, in so doing, strongly supports the more limited successor doctrine developed by the courts of appeal but not as yet expressly declared by the Supreme Court.

It can now be considered settled that if the transfer of assets and employees from one employer to another leaves intact the identity of the employing enterprise, then the former's duty to recognize and bargain with an incumbent union devolves upon the latter as "successor employer." See NLRB v. Downtown Bakery Corp., 330 F.2d 921 (6th Cir. 1964); NLRB v. McFarland, 306 F.2d 219 (10th Cir. 1962); NLRB v. Auto Ventshade, Inc., 276 F.2d 303 (5th Cir. 1960); NLRB v. Parran, 237 F.2d 373 (4th Cir. 1956); NLRB v. Lunder Shoe Corp., 211 F.2d 284 (1st Cir. 1954); NLRB v. Armato, 199 F.2d 800 (7th Cir. 1952); NLRB v. Blair Quarries, Inc., 152 F.2d 25 (4th Cir. 1945); compare NLRB v. John Stepp's Friendly Ford, Inc., 338 F.2d 833, 835–836 (9th Cir. 1964).

The record shows that Overnite continued Rutherford's business and, with respect to the pertinent Pulaski and Roanoke terminals, made no significant changes in their operation. Overnite offered employment to all of the terminal employees, and they all accepted. The Pulaski and Roanoke drivers, who punched in on a Rutherford time card the morning of November 19, punched out on an Overnite time card that afternoon. The terminal managers and supervisory personnel remained as before. Rutherford's President McInturff, who had bargained with the Union before take-over, bargained thereafter with the Union as "Assistant to the President" of Overnite. In sum, everything was essentially the same at Pulaski and Roanoke after November 19 as it was before the sale, except for the change in ownership.

Clearly, the Board concluded correctly that Overnite was "successor" to Rutherford. As such, Overnite had a duty to bargain on the day of take-over, November 19, 1964, which it did not recognize until eleven days later on November 30. We do not mean to imply that Overnite had on November 19 an affirmative duty to at once seek out the Union to begin bargaining. But, neither was it free to act unilaterally without affording the Union reasonable opportunity to bargain.

We cannot say that Overnite's belated recognition of the Union purged it of refusal to do so eleven days sooner. Overnite's instant unilateral action in violation of its duty to bargain has made it impossible to determine what would have occurred had it moved more slowly.

### III.

Section 8(a) (5) of the Labor Act, read together with Section 8(d),[5]

4. The Union's quarrel with the Board about the continuation of the contract, discussed hereinabove, is partly caused by its wish to bring to bear upon this case the full force of *Wiley*, as well as its wish to enforce the entire collective bargaining agreement against Overnite.

5. The pertinent sections of the Act read as follows:
Section 8 "(a). It shall be an unfair labor practice for an employer—

"(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;
\* \* \* \* \*
"(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title.
\* \* \* \* \*
"(d) For the purposes of this section, to bargain collectively is the perform-

requires an employer to bargain collectively with the representative of his employees "with respect to wages, hours, and other terms and conditions of employment." It is not disputed that Overnite made the wage and economic benefit changes without affording opportunity to the Union to bargain. Such unilateral action by an employer altering existing wage and economic benefits usually violates the statutory command. Considering the record as a whole, there do not appear to be circumstances "excusing or justifying unilateral action." See NLRB v. Katz, 369 U.S. 736, 748, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962). We think the Board's finding of a Section 8(a) (5) violation is clearly correct.

■ An 8(a) (5) violation does not necessarily encompass an 8(a) (1) violation. See NLRB v. Katz, 369 U.S. at 742 n. 9, 82 S.Ct. at 1111, 8 L.Ed.2d at 235. But here the manner of action—aside from it being unilateral—supports an inference of an 8(a) (1) violation. When the individual employees were told their new rates of pay and other conditions of employment, the company spokesman said: "As you all know we are not union and we are not planning on being union." We do not hold such a statement *per se* impermissible, but it colored the conduct, especially in view of this company's history of several previous violations of the Act.[6]

■ We think the Board's finding of an 8(a) (1) violation is more than simply derivative from the refusal to bargain and is correct.

## IV.

■ There is no need to discuss at length Overnite's reliance upon the Interstate Commerce Commission proceedings to justify its conduct. That by reason of its participation in these proceedings the Union knew precisely what Overnite proposed and intended to do on initial employment of ex-Rutherford employees is of no consequence. The very premise of bargaining is that firm intentions may be changed by the process. Knowing what Overnite intended to do is not the same as being notified that it is about to do it. Neither one is the equivalent of being afforded the opportunity to discuss and bargain about the intended changes.

■ Overnite contends that the power of the ICC to condition approval of the sale and transfer of assets upon the vendee's agreeing to fair and equitable protection of employees, and its partial exercise of that power,[7] precludes the Labor Board from granting further protection under the National Labor Relations Act. This contention is without merit. "The control of collective bargaining is vested in the Labor Board, not in the Interstate Commerce Commission." NLRB v. Parran, supra, 237 F.2d at 375. Whatever the ICC may do, the Labor Board retains full authority to provide further protection of employees in enforcement of the National Labor Relations Act. Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962); Local 1976, United Brotherhood of Carpenters and Joiners of America, A. F. L. v. NLRB,

ance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession * * *." 29 U.S.C.A. § 158 (a) (1), (5), (d).

6. Entirely aside from the finding of the Labor Board of violation of the Act by unilateral company action, it appears from the decision of the Trial Examiner, which was adopted by the Board, that the Examiner weighed conduct of Overnite pointing to subjective bad faith in its dealings with the Union. The Trial Examiner took "official notice" of prior decisions of the Board finding Overnite in . violation of the Labor Act.

7. Overnite was required to agree that any employee displaced by the sale should receive three months severance pay.

357 U.S. 93, 78 S.Ct. 1011, 2 L.Ed.2d 1186 (1958).

## V.

The Board's order requires Overnite to make the affected employees whole for losses caused by the unilateral changes in working conditions. The exact computation will require further proceedings before the Board or an agreement between the parties.

Because the relation of remedy to policy is peculiarly a matter for administrative competence, the task of devising remedies to effectuate the policies of the Labor Act is that of the Board. Even orders making necessary a restoration by way of back pay should stand unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act. NLRB v. Seven-Up Bottling Co., 344 U.S. 344, 73 S.Ct. 287, 97 L.Ed. 377 (1953); NLRB v. Gullett Gin Co., 340 U.S. 361, 71 S.Ct. 337, 95 L.Ed. 337 (1951); Virginia Electric & Power Co. v. NLRB, 319 U.S. 533, 540, 63 S.Ct. 1214, 87 L.Ed. 1568 (1943); Phelps Dodge Corp. v. NLRB, 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271 (1941).

We are unable to agree with Overnite's characterization of the proposed remedy as "extraordinary." The first order of the Board, published in 1935, required reinstatement with back pay. That the remedy is drastic does not make it extraordinary. An order requiring restoration to *status quo ante* to insure meaningful bargaining is plainly within the discretionary power of the Board. Fibreboard Paper Products Corp. v. NLRB, 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964).

An order of enforcement, without modification, will be entered.

Enforced.

ALBERT V. BRYAN, Circuit Judge (dissenting):

I have no disagreement with the majority's opinion in its remonstrance of Overnite for reducing the compensation of Rutherford's erstwhile employees without first bargaining with their Union. I do disagree, however, with the extent of the order of reparation. Specifically, I think the period of restoration is too great, a span not justified by the evidence.

In this respect I do not think the period of restoration can be viewed exclusively as a part of the remedy resting in the discretion of the Board. Actually, the vast portion of it occurs in the protraction of the refusal-to-bargain-time by the Board. There is no evidence to support this prolongation of the period of refusal.

As I read the order, it requires payment by Overnite of the difference between the wages (including fringe benefits) theretofore paid by Rutherford and the lesser wages offered by Overnite. With the Board, I think this default commenced with the transition date of November 19, 1964—from Rutherford to Overnite. But I do not understand how it can go beyond the day when Overnite explicitly or implicitly declined to meet the demands of the Union, after a reasonable time of bargaining. Overnite was not obligated to pay the higher compensation after that date. I do not see any basis whatsoever for requiring the difference in wages etc. to be made good from November 19, 1966 until and beyond the present time, as the Board and now the Court direct.

That there was bargaining after the transfer from Rutherford to Overnite appears unrefuted in the record. First, it is found in Overnite's letter to the Union, dated November 30, 1964, less than two weeks after the transfer, stating the Company is "willing to recognize and bargain for contracts with the appropriate unions in separate and appropriate units at Pulaski and Roanoke". Then there is the testimony of the Union representatives that there were negotiations beginning on January 12, 1965, continuing thereafter at the rate of approximately two meetings a month. As to their content the local's attorney was questioned and testified as follows:

"Q. Do you remember that at any time they specifically asked expressly,

'Shall we go now into a discussion of wages, pension plan, insurance,' and the like?

"A. They have generally taken the position throughout the negotiations that they will negotiate from which ever posture we would care to. However, we—however we wanted to handle it. Which ever proposal we wanted to take up, and to that extent they were willing to discuss it any way we wanted to discuss it."

Surely, the parties would not have continued to meet if all they did was to forgather. The negotiations clearly amounted to bargaining. Nevertheless, the upshot of them all was a refusal of the Company to accede to the Union's demands. This was not unlawful and to me it constituted an impasse.

I would remand for a redetermination of the period of restoration in accordance with the evidence. This would not be an interference with the discretion of the Board in fashioning the remedy. On the contrary, it is compelled by the want of substantial evidence to uphold the restoration-time fixed by the Board.