**NATIONAL LABOR RELATIONS BOARD**
**v. COLTEN et al.**
**No. 8087.**

Circuit Court of Appeals, Sixth Circuit.
June 28, 1939.

Mortimer Wolf, of Washington, D. C. (Charles Fahy, Robert B. Watts, Laurence A. Knapp, and Malcolm S. Mason, all of Washington, D. C., on the brief), for petitioner.

Leo C. Lillie, of Grand Haven, Mich., for respondents.

Before SIMONS, ALLEN, and HAMILTON, Circuit Judges.

SIMONS, Circuit Judge.

The order sought to be enforced is one of March 31, 1938, in response to findings that the respondents had engaged in unfair labor practices in violation of the National Labor Relations Act, 29 U.S.C.A. § 151 et seq. It requires that they cease and desist from discouraging membership in the Amalgamated Clothing Workers of America or other labor organization of its employees, from dominating, interfering with, or financially or otherwise supporting an organization of employees known as Kiddie Kover Employees' Association, from refusing to bargain collectively with Amalgamated as the exclusive representative of its production employees, and from interference with the rights of employees to self organization under § 7 of the Act. Affirmatively the respondents are required to offer reinstatement to one Mary Kule, and to make her whole for losses of pay by reason of discharge, to offer reinstatement upon application to striking employees, and in event of refusal to make them whole for losses of pay by reason of such refusal, to bargain with Amalgamated as the exclusive representative of their employees, to withdraw recognition from Kiddie Kover Association as such representative, and to post the usual notices of compliance.

The respondents were co-partners in Grand Haven, Michigan, doing business as the Kiddie Kover Manufacturing Com-

pany. After service upon them of the Board's order Colten died, and Ethel C. Colten was appointed executrix of his estate. Notice has been served upon her of the filing of the present petition, and she has appeared in the proceeding. The Board seeks as against her a decree which will but require her jointly and severally with the surviving partner to compensate employees for back wages directed to be paid under the order. As against Colman, the surviving partner, the Board seeks full compliance with the order on the ground that the business of the partnership is being continued by him and under the partnership name.

■ The first challenge to the petition is based upon the contention that the respondents were not engaged in interstate commerce and so not within jurisdiction of the Board. It appears, however, that for an eighteen month period ending shortly before the filing of the complaint, approximately 95% of the respondents' total purchases of raw materials and sales of finished products moved to and from its plant in Grand Haven in interstate commerce. In the light of the expanding concept of interstate commerce, and of circumstances under which the impact of industrial strife burdens and obstructs such commerce, it is now idle to renew assault already repeatedly repelled upon the jurisdiction of the Board. National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352; and associated cases; Santa Cruz Fruit Packing Co. v. National Labor Relations Board, 303 U.S. 453, 58 S.Ct. 656, 82 L.Ed. 954; Clover Fork Coal Co. v. National Labor Relations Board, 6 Cir., 97 F.2d 331; National Labor Relations Board v. Kentucky Fire Brick Co., 6 Cir., 99 F.2d 89.

■ The controversy between the respondents and their employees which led to complaint, hearing before the Board and final order, had its inception on March 18, 1937, when upon a rumor of dissatisfaction among its employees the fear of a sit-down strike caused the respondents to close their plant and to post notices that it was temporarily shut down because of lack of materials. Their employees were at this time unorganized. Upon the closing of the plant, however, the workers solicited the aid of the Amalgamated Clothing Workers of America, and a representative of that union arrived in Grand Haven to see what could be done. A group of forty employees addressed by the union agent voted unanimously for representation by the Amalgamated, and a number of them signed membership cards. A conference with Colman resulted in a tentative agreement for settlement of difficulties and a return to work. A second meeting, attended by over sixty, was informed of satisfactory progress, and a written agreement prepared by respondents' counsel and signed by Colman was entered into recognizing the Amalgamated as the bargaining representative of the workers. The employees agreed to return to work March 22d, appointed a union shop committee, and received assurances from the management that the respondents would not interfere with union activities pending a resumption of negotiations upon Colten's return from Europe April 15th. The union representative thereupon returned to Chicago. The total number of employees in the plant at that time was eighty. Fifty-three of these had signed membership pledges in the union. They were production workers, and it is conceded that this group is an appropriate unit for purposes of collective bargaining.

■■ Shortly thereafter the management launched a campaign of coercion and intimidation designed to influence the majority of employees to withdraw from the union, a campaign accelerated upon Colten's return to Grand Haven. It will serve no purpose to review the record in this respect. There is substantial evidence to support the findings of the Board, including warnings by supervisory employees that workers would lose their jobs and threats by Colman that the respondents would go out of business if there was a union in the shop.

On April 2d the management undertook a poll of its employees on the question whether they preferred to bargain directly with the management or through the union. The tally is asserted to show a majority of 52 to 21 against the union, and on the strength of this vote the respondents refused and have continued to refuse to negotiate with the Amalgamated. The Board declined to recognize this election as representing a free expression of choice on the part of the employees so as to absolve the respondents from the charge of unfair practice in refusing to bargain collectively with an organization previously

selected as the bargaining agent. There is substantial evidence that the vote was neither secret nor uninfluenced. Colman herded the employees to the table where the ballots were marked and gave each her ballot as she approached. The respondents' bookkeeper sat on the other side of the table making notations as the voters marked their ballots, and they were in such form as to make the voter's choice discernible. The vote was assertedly counted by Colman, Osterhous (respondents' attorney), and Cook, the mayor of Grand Haven. Cook testified, however, that he had not seen the ballots. There was evidence that the manner in which the vote was taken engendered fear among the employees of unfortunate consequences if it resulted unfavorably to the management. Upon the refusal of the respondents to bargain with the union as the result of the balloting, the union members went out on strike and the plant closed down on April 6th. Promptly there was formed the Kiddie Kover Employees' Association, hostile to the union. The details of its organization need not be recited. It is sufficient to say that there is substantial evidence to support a conclusion that if not initiated it was fostered, financially and otherwise supported, by the respondents, and in essential respects a company union, the fostering of which is condemned as an unfair practice by § 8(2) of the Act. The technique of its organization and maintenance was more or less conventional. The findings of the Board are supported by evidence, and in so far as they fail to recognize the April 2d poll as decisive of majority withdrawal from the union, will be accepted. National Labor Relations Board v. Remington Rand, Inc., 2 Cir., 94 Fed.2d 862.

 The findings and order of the Board in respect to the discharge and reinstatement of Mary Kule are also supported by evidence. The defense that her discharge on March 27th was attributable to inefficiency is in conflict with direct evidence and the permissible inferences to be drawn from her record and the time and circumstance of her discharge. It is the province of the Board to weigh the evidence and determine the ultimate facts.

 A problem of first impression is presented by the fact that the respondents constituted a co-partnership, terminated as an entity by the death of Colten. It is argued that the affirmative provisions of the order directing the reinstatement of Mary Kule and striking employees and the payment of their wages is invalid. Since all employees were employees at will, with no fixed term, it is urged that they ceased to be employees of the partnership upon the death of Colten, and this without regard to the existence of a labor dispute. The Act but provides, it is said, that the employer-employee relationship is not terminated by a strike, but this does not reach a situation where the relationship is terminated by the death of a partner or operation of law, and authorities and texts are cited, including Wood, Master and Servant, § 163, where it is said: "Where a servant is employed by a firm a dissolution of the firm dissolves the contract," and, "If the dissolution results from the death of a member of the firm, the dissolution resulting by operation of law and not from the act of the party, no action for damages will lie."

This contention, however, ignores the essential nature of regulatory statutes of the class here considered, and the scope and purpose of administrative orders made in exercise of powers conferred by such legislation. They are to implement a public social or economic policy not primarily concerned with private rights, and through remedies not only unknown to the common law but often in derogation of it. The able exposition of the essential character of the National Labor Relations Act by Judge Hutchinson in Agwilines, Inc. v. National Labor Relations Board, 5 Cir., 87 F.2d 146, 150, 151, is as appropriate to the present problem as it was to the question by him discussed: "The procedure the statute outlines is not designed to award, the orders it authorizes do not award, damages as such. The proceeding is not, it cannot be made, a private one to enforce a private right. It is a public procedure, looking only to public ends. The statute has in mind the maintenance and furthering of industrial amity, and therefore peace, the prevention of industrial war. * * * The procedure provided here looks, to, the orders authorize, cease and desist orders to bring unfair practices to an end. That they reprobate and end them from the beginning presents no constitutional difficulty. * * * When the practices are found to be the wrongful discharge of employees, and the wrongful failure to restore them to work because of their union activities, it is clear, we think,

that a cease and desist order, made operative under the authority of the statute from the time of discharge, is as clearly within constitutional authority as if made effective alone for the future." And again: "The statute authorizes reparation orders not in the interest of the employee, but in the interest of the public. A cease and desist order operating retrospectively is not a private award, operating by way of penalty or of damages. It is a public reparation order, operating retrospectively by way of an order to cease and desist as to unfair practices, from their beginning; practices as to which, because forbidden in the interest of industrial amity, and therefore peace, Congress has the right to eradicate them as from the beginning."

In this view of the Act it seems to us unimportant that the proceedings were styled as against Colten and Colman, co-partners, doing business as The Kiddie Kover Company. It is the employing industry that is sought to be regulated and brought within the corrective and remedial provisions of the Act in the interest of industrial peace. The term "co-partners" may not then be regarded as more than a term of description, or as denoting a legal entity which alone is subject to the command of the order. It needs no demonstration that the strife which is sought to be averted is no less an object of legislative solicitude when contract, death, or operation of law brings about change of ownership in the employing agency. Moreover, a cease and desist order is of the nature of an injunction, and its affirmative provisions analogous to those of one that is mandatory. It would be an implausible contention that the death of a partner subject to restraint relieved survivors of its burdens.

■ A last contention remains to be noted. As is not infrequent, there was some violence upon the picket line. The respondents initiated contempt proceedings for violation of a temporary injunction theretofore issued out of the Circuit Court of Ottawa County against thirteen of the strikers, and it is argued that the provisions of the order directing the reinstatement of these employees are invalid under National Labor Relations Board v. Fansteel Metallurgical Corp., 59 S.Ct. 490, 83 L.Ed. 627. No finding of guilt was, however, made as to them in the contempt proceedings, nor any finding that the violence was directed toward seizure of the respondents'

property. The offenders were not identified, and upon hearing the Circuit Judge released those accused with an admonition that they should, and upon their promise that they would, abide by the provisions of the injunction. The record does not show that the accused employees were discharged by the respondents by reason of their alleged violation of the injunctional order. The Fansteel decision does not in our judgment require a modification of the order in the respect indicated. Cf. National Labor Relations Board v. Stackpole Carbon Co., 3 Cir., 105 F.2d 167, decided May 12, 1939.

A decree for enforcement will issue in conformity with the prayer of the petition.