## NATIONAL LABOR RELATIONS BOARD v. ADEL CLAY PRODUCTS CO. et al. No. 12481.

Circuit Court of Appeals, Eighth Circuit.

April 1, 1943.

Russell Packard, Atty., National Labor Relations Board of Chicago, Ill., (Robert B. Watts, Gen. Counsel, Ernest A. Gross, Associate Gen. Counsel, Howard Lichtenstein, Asst. Gen. Counsel, and Louis Libbin and James T. Termini, all of Washington, D. C., Attys., National Labor Relations Board, on the brief), for petitioner.

E. B. Carpenter and Robert J. Bannister, both of Des Moines, Iowa (Stipp, Perry, Bannister & Starzinger, of Des Moines, Iowa, on the brief), for respondents.

Before GARDNER, SANBORN, and THOMAS, Circuit Judges.

SANBORN, Circuit Judge.

The National Labor Relations Board has petitioned for the enforcement of its order of September 24, 1942, directing the respondents to cease and desist (a) from discouraging membership in the International Union of Mine, Mill and Smelter Workers or any other labor organization of their employees; (b) from giving effect to any contract of employment now in existence between the respondents and their individual employees, or requiring, as a condition of employment, execution of such contracts by the individual employees; and (c) from in any other manner interfering with, restraining or coercing their employees in the exercise of the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives · of their own choosing, or to engage in con-

certed activities for the purposes of collective bargaining or mutual aid and protection. The order also requires the respondents to take the following affirmative action: (a) offer reinstatement to Glen Smith, a former employee, and reimburse him for any loss of wages; (b) post the usual notices of compliance; and (c) notify the Regional Director of steps taken to comply with the order. The order is based upon the findings by the Board that the respondents had violated Section 8(1) and (3) of the National Labor Relations Act, 49 Stat. 449, 29 U.S.C.A. § 151 et seq.

The respondents assert that the order and the findings of the Board are without adequate evidentiary support; that in attempting to make the order applicable to the partnership doing business as Adel Clay Products Company, the Board has exceeded its powers; and that the petition for enforcement of the order should be denied.

Adel Clay Products Company, an Iowa corporation, was organized in 1916. Until July, 1941, it manufactured brick and building tile at a plant near Redfield, Iowa. It shipped its products in interstate commerce. Prior to 1935, all of the stock of the corporation was owned by H. R. Straight, his wife, Ethel Straight, and his brother, M. T. Straight. In 1935 or 1936, H. R. Straight and his wife transferred their stock to their children, Lee Straight, Dorothy Straight, and Betty Straight Ogg. In July, 1941, the stockholders of the corporation formed Adel Clay Products Company, a partnership, the interest of each partner being in proportion to his stock in the corporation. The business of the corporation and all of its assets, except farm lands, were transferred to the partnership. The plant of the corporation was taken over by the partnership and operated, without interruption, under exactly the same management as that which had previously conducted the business, and with the same personnel. The corporation was not dissolved, but, after the transfer, it had no interest in the brick and tile business.

H. R. Straight has been and is the President of the corporation. While it was in the manufacturing business, he was plant manager and superintendent and was virtually in complete control of production and of the employment of labor at the plant. After the formation of the partnership, his relation to the business and

the plant has remained the same. M. T. Straight resides in Des Moines, Iowa, and is and has been in charge of the sales end of the business. H. R. Straight, sometimes after consultation with his brother, M. T. Straight, has determined all questions of policy affecting employment and production. The children of H. R. Straight have had nothing to do with the management of the business.

No effective organization of the employees of the plant for purposes of collective bargaining was ever formed. In 1937 an ineffectual attempt to form an independent union to represent the employees was made, which the National Labor Relations Board found was sponsored by the company. In 1939, the International Union of Mine, Mill and Smelter Workers (affiliated with the C. I. O.) made an effort to organize the employees of the plant, but only a few of them joined, and the effort failed. The Board's evidence showed that the management of the plant was openly hostile to the unionization of its employees, and that H. R. Straight told the employees that the plant could not pay the union scale of wages and continue to operate; and that he made other statements tending to discourage the employees from joining the union.

Operations at the plant were seasonal. The policy of the management was, and for a number of years had been, to enter into written contracts with its employees individually, relative to hours and pay, prior to the opening of the plant for each production season. These individual contracts contained no provisions relative to joining or not joining unions, or with respect to self-organization, to collective bargaining or to the right to strike, but they did contain a provision giving the management the power to discharge an employee for any reason which it deemed sufficient. The signing of the contract was made a condition of employment.

The evidence of the Board indicated that, prior to the opening of the production season in 1941, at a meeting of the employees called for the purpose of discussing the terms of the employment contracts for that season, H. R. Straight told the employees, in effect, that the management would not tolerate union organization, that if he found out who were agitating unionization of the plant he would discharge them, and that the employees could either sign the proposed individual contracts or go home. In 1942 the partnership continued the previously existing policy of requiring individual contracts of employment with the employees. There was no evidence as to the circumstances surrounding the making of the contracts in 1942.

The Board's evidence as to the former employee Glen Smith showed that he had been regularly employed for a number of production seasons prior to 1941 as a "burner"; that he was the most active union man at the plant; that he had solicited members for the union, and had held union meetings at his home. The Board's evidence further showed that in May, 1941, at the time the plant opened for the 1941 season, Smith had not signed a contract; that, after the plant was in operation, he was tendered a job as a common laborer on condition that he sign a contract, but was told by H. R. Straight that he could not have his position as a "burner" because he talked too much about the union; that Smith was not unwilling to sign a contract if he could have his old position as a "burner," but was unwilling to sign a contract to work as a common laborer. Straight denied that he told Smith that he could not have a job as a "burner" because of his union activities, but the Board credited Smith's evidence in that regard.

All of the acts upon which the Board's findings of unfair labor practices are based took place prior to the formation of the partnership in July, 1941.

It must be remembered that in such a case as this, the only function of this court is to determine whether the Board, acting within the compass of its power, has made findings based upon substantial evidence and has ordered an appropriate remedy. National Labor Relations Board v. Bradford Dyeing Ass'n, 310 U.S. 318, 342, 60 S.Ct. 918, 84 L.Ed. 1226; Eagle-Picher Mining & Smelting Co. v. National Labor Relations Board, 8 Cir., 119 F.2d 903, 907. It is for the Board to determine the credibility of witnesses and the weight of evidence, and to appraise the "imponderables." See National Labor Relations Board v. Link-Belt Co., 311 U.S. 584, 597, 599, 61 S.Ct. 358, 85 L.Ed. 368. Whether, under the evidence, this court would reach the same conclusions as the Board is immaterial, and the court may not substitute its judgment for that of the Board on disputed issues of fact, or-

question its determination of matters which it had authority to decide. National Labor Relations Board v. Waterman Steamship Corp., 309 U.S. 206, 226, 60 S. Ct. 493, 84 L.Ed. 704; Pittsburgh Plate Glass Co. v. National Labor Relations Board, 8 Cir., 113 F.2d 698, 701. It is apparent that, upon review, this court must assume as established all the facts that the evidence supporting the Board's determination reasonably tends to prove, and must give to the Board the benefit of all of the inferences fairly deducible from such facts.

We think that only two substantial questions are presented for decision:

1. Is paragraph (b) of the cease and desist order, prohibiting the respondents from giving effect to any existing contracts of employment between the respondents and their individual employees and from requiring, as a condition of employment, the execution of any such contracts by the individual employees, valid?

2. Is the Board entitled to the enforcement of its order as against the partnership, which did not, in taking over the business and assets of the corporation, agree to assume obligations of the corporation arising under the National Labor Relations Act?[1]

■ The Board found that "by their course of conduct in requiring their employees to execute individual contracts of employment at the beginning of each production season and in the statements of H. R. Straight * * * the respondents have interfered with, restrained, and coerced their employees in the exercise of the rights guaranteed in Section 7 of the Act." We do not understand that the Board concluded that the contracts contained provisions which expressly prohibited the employees from exercising such rights. It found that, after the attempt was made to unionize the plant in 1939, the contracts were utilized as a means of defeating unionization and discouraging collective bargaining. The evidence of the Board as to the circumstances surrounding the making of these contracts, particularly in 1941, we think sustains the inference which the Board drew as to their purpose and probable effect.

■ We construe paragraph (b) of the cease and desist order as precluding the respondents from deriving any benefits from contracts so procured by the respondents or from exacting similar contracts under similar circumstances in the future, but not as preventing the respondents from lawfully contracting with the employees individually under circumstances which negative any intent to interfere with their rights.[2] As so construed, we cannot say that paragraph (b) transcends the power of the Board.[3] The fact that the policy of the management to require the signing of individual contracts by its em-

[1] In July, 1941, when the partnership took over the business this proceeding had not been initiated, and the Board does not claim that the transfer was made in anticipation of any such proceeding.

[2] The Board says, in discussing the remedy to be applied:

"We have further found that by reason of the circumstances surrounding the execution of the individual contracts of employment at the beginning of each production season, as a condition of employment, the respondents interfered with, restrained, and coerced their employees in the exercise of the rights guaranteed by the Act. Accordingly, we will order that the respondents cease giving effect to any of such contracts of employment which are now in existence and to discontinue such practice in the future, but nothing in our order shall be construed as requiring the respondents to vary these wage, hour, and other substantive features of their relationship with the employees which the respondents may have established in performance of these contracts as extended, renewed, modified, supplemented, or superseded.

[3] See and compare: National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 45, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352; National Licorice Co. v. National Labor Relations Board, 309 U.S. 350, 364–367, 60 S.Ct. 569, 84 L.Ed. 799; National Labor Relations Board v. Superior Tanning Co., 7 Cir., 117 F.2d 881, 890, 891, 892, certiorari denied, 313 U.S. 559, 61 S.Ct. 834, 85 L.Ed. 1520; National Labor Relations Board v. Grower-Shipper Vegetable Ass'n, 9 Cir., 122 F.2d 368, 377; National Labor Relations Board v. Sands Mfg. Co., 6 Cir., 96 F.2d 721, 724, affirmed 306 U.S. 332, 59 S.Ct. 508, 83 L.Ed. 682; Peninsular & Occidental S. S. Co. v. National Labor Relations Board, 5 Cir., 98 F.2d 411, 415, certiorari denied 305 U.S. 653, 59 S.Ct. 248, 83 L.Ed. 423; National Labor Relations Board v. Sterling Electric Motors, Inc., 9 Cir., 109 F. 2d 194, 202.

346

ployees was long established, we think, did not prevent the Board from finding that, after unionization of the plant became imminent, the policy was used as a means of interfering with the rights of the employees.

 The contention of the respondents that the Board's order may not lawfully be enforced against the partnership is, we think, untenable and largely academic, in view of the circumstances. Aside from the reinstatement of Glen Smith and the payment of his loss of wages, if any, the order compels the partnership (which, to all intents and purposes, is a mere continuation of the corporation) to do only what the law requires. In view of the unchanged management, a recurrence of the acts which the Board found had taken place prior to July, 1941, might reasonably be anticipated by it. If a wage loss suffered by Glen Smith, due to the failure of the corporation to reinstate him in the spring of 1941 because of his union activities (as the Board found), should be paid by the corporation, and not by the partnership, that matter can be adjusted between the corporation and the partnership, both of which are controlled by the same individuals. The Board found that "the change in structure from the corporation to the partnership resulted in no change in the employer-employee relationship" and that the corporation and the partnership were so interrelated as to justify the order of the Board with respect to the partnership. Under the circumstances, we think the Board was justified in drawing these conclusions. The purpose of the Act is to prevent, in the public interest, industrial strife which has a tendency to burden interstate commerce, and is not to enforce private rights, and the remedies which the Board is authorized to prescribe have little analogy to the common law remedies for the collection of debts. See National Licorice Co. v. National Labor Relations Board, 309 U.S. 350, 363, 60 S.Ct. 569, 84 L.Ed. 799; National Labor Relations Board v. Colten, 6 Cir., 105 F.2d 179, 182. As was said by the United States Circuit Court of Appeals of the Sixth Circuit in the Colten case (page 183 of 105 F.2d):

"It is the employing industry that is sought to be regulated and brought within the corrective and remedial provisions of the Act in the interest of industrial peace. The term 'co-partners' may not

then be regarded as more than a term of description, or as denoting a legal entity which alone is subject to the command of the order. It needs no demonstration that the strife which is sought to be averted is no less an object of legislative solicitude when contract, death, or operation of law brings about change of ownership in the employing agency. Moreover, a cease and desist order is of the nature of an injunction, and its affirmative provisions analogous to those of one that is mandatory."

Compare National Labor Relations Board v. Hearst, 9 Cir., 102 F.2d 658, 663. We need go no further than to say that the partnership, having taken over the plant, the business and the assets of the corporation, with the same management and the same employees, and having failed to show that any change of policy relative to labor relations had taken place, is not entitled, as a matter of law, to be relieved from the remedial measures which the Board deemed necessary to remove the effects of the unfair labor practices found to exist and to prevent a recurrence. After all, whether the Straight family conducted their brick and tile business as a corporation or as a partnership is not, we think, a matter of controlling significance from the standpoint of the public interest.

Our conclusion is that the Board is entitled to the enforcement of its order, and that its petition must be granted.