**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**JONES SAUSAGE COMPANY and Jones Abattoir Company, Respondents.**

No. 7656.

United States Court of Appeals Fourth Circuit.

Argued June 11, 1958.

Decided July 12, 1958.

Rosanna A. Blake, Attorney, National Labor Relations Board, Washington, D. C. (Jerome D. Fenton, General Counsel, Thomas J. McDermott, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, and Frederick U. Reel, Attorney, National Labor Relations Board, Washington, D. C., on brief), for petitioner.

E. C. Brooks, Jr., Durham, N. C. (Eugene C. Brooks, III, Durham, N. C., on brief), for respondents.

Before SOBELOFF, Chief Judge, and SOPER and HAYNSWORTH, Circuit Judges.

SOBELOFF, Chief Judge.

The National Labor Relations Board found the respondents, Jones Sausage Company and Jones Abattoir Company, guilty of violating Secs. 8(a) (1) and (3) of the Act, 29 U.S.C.A. § 158, in laying off two employees, Lena Mae Farrior and Willie Mae Hinton, because of their union activities. It found the respondents guilty also of violating Sec. 8(a) (1) by interrogating these and other employees concerning union activities, threatening to withdraw employee benefits, to reduce the work force, and to close the plant if the employees joined the union. The Board ordered the respondents to cease and desist from their illegal conduct and to reinstate these two employees without prejudice to their rights and with back pay. This is the Board's petition for enforcement of its order. 29 U.S.C.A. § 160(e).

### I—Jurisdictional Question

The respondents complain that it was improper for the Board to assert jurisdiction in this case. It is said that the two companies should not be treated as a unit, and it is suggested that, considered separately, the requisite volume of business is not transacted by one of them, Jones Sausage Company. Under Board practice, it does not ordinarily entertain proceedings against an employer whose total annual interstate purchases are less than $500,000, but the statute itself contains no such limitation upon the Board's jurisdiction. 29 U.S. C.A. § 160.

Jones Sausage Company, a corporation formed in 1947, is engaged in processing meat. Jones Abattoir Company, also a corporation, was formed in 1955 and slaughters hogs and cattle. The annual interstate purchases of the former exceed $340,000; those of the latter, $570,000. The abattoir sells ninety percent of its products to the sausage company, the amount of such sales exceeding $900,000 annually. Two brothers, Garland Jones and Earl Jones, own all but one share of the abattoir's stock and are its president and vice president, respectively. They are also vice president and secretary-treasurer, respectively, of the sausage company, in which they are major stockholders. The two companies occupy the same building in Garner, North Carolina. The quarters of the two are connected by an open door. The records of the two businesses are kept in the office of the sausage company. Garland Jones is the general manager of both plants, and the plant manager for both is under his supervision and control. The other brother, Earl Jones, is business manager for both concerns.

On February 1, 1956, Jones Sausage Company had one hundred and twenty-four rank and file employees, and the abattoir eight or nine. The respondents stress that there was no interchange of employees; also, that the sausage company had a pension plan for its employees, while the abattoir did not. On the other hand, all the employees had the same hospitalization and vacation plans, which Earl Jones testified was

necessary "where [they] are working so close together." Also, it is pointed out that the abattoir's employees had a guaranteed fifty-hour work week, whereas only a very few of the sausage company's employees had a guaranteed work week.

In these circumstances, the substantial identity of ownership and control of the two enterprises, their occupancy of a single building, and the integration of their activities, warranted the Board's finding that they constituted a single employer engaged in commerce within the meaning of Section 2 of the Act. National Labor Relations Board v. A. K. Allen Co., 2 Cir., 1958, 252 F.2d 37, 40. Cf. National Labor Relations Board v. Williams, 4 Cir., 1952, 195 F.2d 669; National Labor Relations Board v. National Shoes, 2 Cir., 1953, 208 F.2d 688.

Even if we were to consider the two units separately, we would reach the same conclusion. While Jones Sausage Company's purchases amounted to less than $500,000, unquestionably each unit was legally within the jurisdiction of the Board. Despite the Board's practice of concentrating upon larger employers, to achieve maximum results with a limited budget, we find no illegality or abuse in its exercise of jurisdiction in this instance. The language of the Supreme Court, speaking through Mr. Justice Burton, in National Labor Relations Board v. Denver Bldg. Council, 1951, 341 U.S. 675, 684, 71 S.Ct. 943, 949, 95 L.Ed. 1284, is apposite:

"Even when the effect of activities on interstate commerce is sufficient to enable the Board to take jurisdiction of a complaint, the Board sometimes properly declines to do so, stating that the policies of the Act would not be effectuated by its assertion of jurisdiction in that case. Here, however, the Board not only upheld the filing of the complaint but it sustained the charges made in it.

"The same jurisdictional language as that now in effect appeared in the National Labor Relations Act of 1935 and this Court said of it in that connection: 'Examining the Act in the light of its purpose and of the circumstances in which it must be applied we can perceive no basis for inferring any intention of Congress to make the operation of the Act depend on any particular volume of commerce affected more than that to which courts would apply the maximum *de minimis.*' National Labor Relations Board v. Fainblatt, 306 U.S. 601, 607, 59 S.Ct. 668, 83 L.Ed. 1014; see also National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893.

"The maxim *de minimis non curat lex* does not require the Board to refuse to take jurisdiction of the instant case." See, also, National Labor Relations Board v. Parran, 4 Cir., 1956, 237 F.2d 373, 375.

## II—The Discharges of Farrior and Hinton

■ (a)—Lena Mae Farrior had been employed by Jones Sausage Company nearly ten years, and in point of service was one of its oldest employees. She was among the first of the respondents' employees to become interested in the union, and its first meeting was held in her home in the middle of January, 1956. On February 12, about twenty-five or thirty Jones employees attended a union meeting at the Elks Club in Raleigh. Learning of this, General Manager Garland Jones sent for her to discuss "union rumors." He showed her a slip of paper bearing the name of the union organizer. According to Farrior's testimony, which the Board accepted, Jones commented: "We don't want this stuff, we don't need it, we are one big happy family. * * * I am just doing the people a favor. * * * I can do without them, I can put two machines in which I have * * * in storage * * * and those machines would do the work of at least four or five people." Jones then inquired how much bonus Farrior would receive, and demanded to know "if the union came in, who [is] going to pay the bonus and look after [the employees]

when [they] got sick." When Farrior admitted to Jones that she had attended the meeting, he requested her to keep in touch with the union organizers and let him know their whereabouts. He told her to "go home and pray and let [him] know what [she] thought about it." The next day her supervisor brought her paycheck to her home, and discharged her with the explanation that "Mr. Jones is cutting down expenses."

Shortly thereafter, Garland Jones addressed a group of his employees at the plant to like effect. He told them they should join the union if they wanted to, that it was a good thing, but that before they did so, they should consider "who [is] going to look after [them] when [they] got sick," and "who is going to sign [their] bonus checks at Christmas." At the same time, he reminded his employees that if they wanted anything, they could always reach him, even at the golf course, and assured them they were his boys and girls, that he loved them, and he hoped they loved him.

(b)—As to Willie Mae Hinton, the testimony is of a not dissimilar pattern. She was overheard by her supervisor, Thurman Bagwell, when she told a fellow employee that she would have attended the meeting at the Elks Club on February 12 if she had known about it. Although she had, in fact, attended, she denied it to her supervisor when he questioned her. He replied that she should not say that, because he knew everybody that attended, inasmuch as he had someone there. Bagwell later told the packing room employees that they need not think they were "pulling a fast one," because he knew the names of the people who attended the union meeting. On February 14, 1956, Bagwell inquired of Hinton if she had signed a union card. Untruthfully, she denied having done so. Bagwell told her not to say that, and indicated that he had independent information, having questioned about fourteen different girls that day.

It was that afternoon that Supervisor Bagwell told Hinton and another employee that some of the girls were to be laid off because the union rules required employees to work five days a week instead of the four days they were then working. He also declared that he knew about the "secret meetings at some of the girls' houses" and warned that before the union came in and told the respondents "what to do," they would close the plant down and send everybody home. At the end of that day, Bagwell laid off employee Hinton.

The same day, according to testimony credited by the Board, Bagwell told a group of employees that this was the "South * * * not the North," that "no union [was] coming in and tell the Jones how to run their place," that it was "one big happy family," and that it was "going to stay that way." There was further testimony that another supervisor, Perry, made similar inquiries about union-organizing meetings of the employees.

Respondents contend that Farrior and Hinton were laid off as part of an effort to stem losses disclosed in the December profit and loss statement; that in all, twenty employees were laid off between February 3 and 17. Of course, if the lay-offs were for economic reasons, the employees may not claim a preferred position by reason of their interest in the union. Union membership or activity does not insulate an employee against the hazards of unemployment due to lack of work or any other reason related to the legitimate management of the business. National Labor Relations Board v. Piedmont Cotton Mills, 5 Cir., 1950, 179 F.2d 345, 347; National Labor Relations Board v. Blue Bell, 5 Cir., 1955, 219 F.2d 796, 798; United Fireworks Mfg. Co. v. National Labor Relations Board, 6 Cir., 1958, 252 F.2d 428, 430. On the other hand, economic reasons may not be asserted to shield an employer against the consequences of his discrimination against an employee who would not have been laid off but for his union activities or membership. North Carolina Finishing Co. v. National Labor Relations Board, 4 Cir., 1943, 133 F.2d 714, 718; National Labor Relations

Board v. Carolina Mills, 4 Cir., 1951, 190 F.2d 675; National Labor Relations Board v. Dant, 9 Cir., 1953, 207 F.2d 165. The circumstances of each case must be weighed to determine what motivations truly dominated the employer in laying off or discharging the employee.

The record discloses ample evidence to sustain the Board's finding that Farrior and Hinton were laid off discriminatorily because of union activities.

Complaints of discriminatory discharges were made by other union members. As to these, however, there was no direct testimony, as in the cases of Farrior and Hinton. The respondents insist that the Board was inconsistent in finding discrimination in respect to these two, while refusing to credit the charges of eight or more other union members. The contention is that, having dismissed the other complaints, the only reasonable conclusion the Board could reach was that Farrior and Hinton must have been discharged, not for union activities but for legitimate economic reasons. It does not necessarily follow, however, in law or logic, that the same conclusion must be reached in respect to each of the complaints. If the Board gave the respondents the benefit of the doubt in respect to those employees as to whom there was no direct evidence, it was not thereby precluded from inferring discrimination and violations of the Act if it found that in respect to these two the evidence was more abundant and convincing.

Before the Board, various reasons other than business losses and lack of work were assigned by the employers for the lay-offs, such as the inability of some employees to get along with others in the group, and "little things" which employees had done contrary to the rules. In the case of Hinton, Supervisor Bagwell asserted belatedly, after he had given testimony and when recalled to the stand, that she "falsified her time card in December." In appraising the evidence, the Examiner credited the alleged time card incident, but took into account that Hinton was not dismissed in De-cember, nor was she among the group first laid off in February. He thought it more than a mere coincidence that her dismissal coincided with the intensification of the organizing activities. The trial examiner and the Board both concluded that tampering with the time card was not the real reason for her lay-off, because she was retained for two months thereafter and was dismissed immediately after her supervisor's conversation with her about her interest in the union.

Viewing the record as a whole, and considering the conflicting inferences urged by the respective parties as to the real reason for the discharges, we are of the opinion that there was substantial evidence to support the conclusion of the Board as to each of these employees. Universal Camera Corp. v. National Labor Relations Board, 1951, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456; National Labor Relations Board v. Spartanburg Sportswear Co., 4 Cir., 1957, 246 F.2d 366. Its order will be

Enforced.