NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

ALUMINUM TUBULAR CORPORATION
and American Flagpole Equipment
Co., Inc., Respondents.

No. 177, Docket 27130.

United States Court of Appeals
Second Circuit.

Argued Jan. 8, 1962.

Decided Feb. 19, 1962.

Judith Bleich Kahn, Washington, D. C. (Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Melvin J. Welles, Atty., National Labor Relations Board, Washington, D. C.), for petitioner.

Bernard P. Lampert, New York City, for respondents.

Before LUMBARD, Chief Judge, and CLARK and FRIENDLY, Circuit Judges.

FRIENDLY, Circuit Judge.

The only significant legal issue presented by this petition by the NLRB to enforce an order to bargain, 130 N.L.R.B. No. 137, is the recurring one of how far the duty of one employer to bargain with a certified union may be enforced against another. The facts are as follows:

Respondent American Flagpole Equipment Co., Inc., hereafter Flagpole, is a New York corporation, organized around 1937. It was owned by William N. Johnson and his wife Margaret, who were its sole officers and directors. It was engaged in the business of manufacturing tubular aluminum poles, flagpoles and re-

lated products at Edgewater Road in the Bronx. Its production and maintenance employees were represented by Shopmen's Local No. 455 of the International Association of Bridge, Structural and Ornamental Iron Workers, AFL-CIO, hereafter the Iron Workers, with which Flagpole has had contracts, the last of which, prior to the events hereafter described, was dated July 1, 1958. The contract was not limited to the Bronx plant, although this was the only one then operated by Flagpole.

In August, 1955, the Johnsons joined with two engineers, Raseman and Gibbs, in forming Aluminum Tubular Corporation, hereafter Aluminum, also a New York corporation. The Johnsons owned 51% of the stock, the engineers 49%. The four stockholders were the directors, the Johnsons and Raseman were the officers, but none of the owners, except Gibbs, who was plant manager until March 1959, received a salary. The two engineers had some new ideas about tapering the aluminum tube that manufacturers furnished. Aluminum began operations in a barn at East Setauket, L. I. Later, in September, 1958, Aluminum leased space in a new building at East Setauket; Flagpole also leased space in the same building and had a small number of employees there.

The record is not too revealing as to just what the difference in the business of the two companies was. Aluminum's activities were, quite clearly, limited to tapered poles used for street lights together with the arms and other accompanying parts. Flagpole made flagpoles, radar masts, traffic signal poles, and also street light poles; we gather that most of its business was in untapered poles but it seems to have made tapered poles also.[1] Neither is it altogether plain what was initially done by the Flagpole employees at East Setauket, as distinguished from those in the Bronx; Mrs. Johnson testified that in August, 1959, after Alumi-

num ceased operating, there was transferred to East Setauket the business "of fabricating aluminum brackets, finishing poles other than eight-inch diameter— the ten, twelve, fourteen-inch poles which were originally made in the Bronx, polishing the flagpole, and shipping direct from East Setauket." From time to time the Johnsons or Flagpole placed their credit back of Aluminum, which had none of its own. In the summer of 1958 the Johnsons applied to a Long Island bank on behalf of Aluminum for a loan to permit the latter's purchase of automatic tapering machinery; the bank considered Aluminum's financial statements inadequate. Statements, prepared by accountants whom the bank recommended, showed Aluminum to be insolvent, with a deficit of $59,665.76, as of December 31, 1958. During the first four months of 1959 it lost an additional $36,440.60. On May 13, 1959, the bank declined to make the loan; thereupon the owners decided to terminate Aluminum's operations.

Meanwhile, on March 31, 1959, the NLRB had conducted an election among Aluminum's employees. Although there were only 8 eligible employees, 11 ballots were cast, 4 of which were challenged. Further proceedings before the Regional Director resulted in elimination of the ballots of 3 voters, and determination that 5 of the 8 eligible employees had voted in favor of representation by United Brotherhood of Carpenters and Joiners of America, AFL-CIO, hereafter the Carpenters, and 2 against, with one challenge not ruled upon. On June 2, 1959, the NLRB issued a certification that the Carpenters had "been designated and selected by a majority of the employees at the East Setauket, Long Island, New York, plant of Aluminum Tubular Corporation, in the unit heretofore found by the Board to be appropriate, as their representative for the purposes of collective bargaining * * * " A copy of this was received by Aluminum in due course.

1. This was Mr. Johnson's testimony; Mrs. Johnson said that, at least at the time of the hearing, Flagpole was not selling tapered tubes other than in fulfillment of Aluminum's contracts.

On June 4, 1959, the Union sent a telegram addressed to "Johnson" and "Aluminum Tubular Corp." at East Setauket, conveying this news and requesting a telephone call to arrange "a mutually satisfactory time and place for the negotiation of a labor management agreement." The telegram was "called in"; the Johnsons were not at the Aluminum plant and did not receive the call. However, counsel for respondents admitted the telegram was received "sometime in June." The Union's financial secretary testified to unsuccessful attempts during June to reach Johnson by telephone and, on one occasion, by going to the East Setauket plant. In August, he succeeded in finding Mrs. Johnson who told him Aluminum was no longer in business.

On June 30, 1959, Aluminum ceased operations. As many of its orders as possible were cancelled. However, Flagpole undertook to complete, using Aluminum's equipment at the East Setauket plant, an order for 5,000 poles for Levittown, Pa., which Mr. Johnson had guaranteed, and some others for which material was in stock. Flagpole's East Setauket operation was a small one; on November 16, 1959, after the transfer of work from the Bronx described above, it had 7 production employees, 5 of whom had been among the 9 employees on Aluminum's final payroll.

Late in June, the Carpenters filed a charge of refusal to bargain against Aluminum; on August 27, 1959, a complaint issued against Aluminum and Flagpole. In November, 1959, respondents' counsel proposed that the Iron Workers and the Carpenters be called in to see whether an agreement could be reached to recognize all production employees at Flagpole's East Setauket plant as an appropriate bargaining unit, and then to hold a consent election to designate a bargaining agent for them. Spurning this suggestion, the General Counsel proceeded to trial. In a report dated May 13, 1960, the Examiner found that Aluminum had violated §§ 8(a) (1) and (5) of the Act, 29 U.S.C.A. § 158(a) (1, 5) by ignoring the Carpenters' telegram of June 4, 1959, and by failing to notify the Carpenters of its intention to discontinue operations after June 30, 1959, and that Flagpole was Aluminum's alter ego. He recommended that they be directed to cease and desist from refusing to bargain with the Carpenters and ordered to bargain with that union for all production and maintenance employees at the East Setauket plant.

Exceptions were filed on June 20, 1960. A three-member panel of the Board, on March 14, 1961, unanimously affirmed the Examiner's finding as to Aluminum. Members Jenkins and Fanning also voted to affirm his finding "that Aluminum and Flagpole comprise a single employer under the Act" but to modify his recommendation so that respondents' obligation "shall be limited to bargaining with respect to the unit of Aluminum's employees for which the Carpenters was certified"; member Leedom voted to dismiss the complaint as to Flagpole.

▆ The Board was warranted in finding that Aluminum was apprised of the Carpenters' desire to bargain and, we suppose, in concluding that it was an unfair labor practice for Aluminum to have failed to answer that there was nothing to bargain about, since it was closing down and transferring some of its employees to Flagpole which had its own labor agreement, although, on the view we take with respect to Flagpole, this must have been one of the least consequential unfair labor practices in the Act's history.[2] Hence we grant enforcement of the order with respect to Aluminum, although, since, as we wish to make plain, we do this on the basis that the "successors and assigns" language shall not be read as including Flagpole, the

2. The situation is quite unlike N. L. R. B. v. Rapid Bindery, Inc., 293 F.2d 170, 171, 176 (2 Cir. 1961), where, having upheld a finding that the newly organized transferee which was continuing the transferor's business was the alter ego of the transferor, we pointed out the importance of notice to the union.

grant would seem futile save in the remote event that Aluminum should resume operations.

■ With respect to Flagpole, the initial question is what the order means when it directs Flagpole to bargain with the Carpenters for "the unit found appropriate by the Board on March 6, 1959, in Case No. 2—RC—9703." This has not been reproduced in the papers before us; but we assume the March 6 decision, like the later one of June 2, referred to Aluminum's production and maintenance employees at East Setauket. Certainly the Board did not make a general direction that Flagpole must bargain with the Carpenters for all the production employees at East Setauket; that was the Examiner's proposal which the Board modified.[3] We asked at the argument whether the direction to Flagpole was to bargain with the Carpenters for the 5 employees who had come over to Flagpole from Aluminum; we were told that too was wrong, and that the order rather means employees of Flagpole doing work formerly done by employees of Aluminum. Whether the order really means that, and whether there now are any such employees, we do not know. If that were the only infirmity in the order, we could either remand for elucidation or leave its application to compliance proceedings. However, we find that there is no warrant for issuing any cease and desist order to Flagpole.

In Cruse Motors, Inc., 105 N.L.R.B. 242, 247 (1953), the Board approved the following statement as to the extent to which a person taking over part or all the business of another is bound to bargain with a union with which the latter was bound to bargain:

"A mere change in ownership of the employment enterprise is not so unusual a circumstance as to affect the certification. Where the enterprise remains essentially the same, the obligation to bargain of a prior employer devolves upon his successor in title. A purchaser in such a situation is a successor employer. [National Labor Relations Board v.] Armato, 199 F.2d 800 (C.A. 7); Southerland's Tennessee Company, Inc., 102 NLRB 1178; Allan W. Fleming, 91 NLRB 612; Blair Quarries, Inc., 152 F.2d 25 (C.A. 4). 'It is the employing industry that is sought to be regulated and brought within the corrective and remedial provisions of the Act in the interest of industrial peace * * * It needs no demonstration that the strife which is sought to be averted is no less an object of legislative solicitude when contract, death, or operation of law brings about change of ownership in the employing agency.' [National Labor Relations Board v. Colten] Kiddie Kover Co., 105 F.2d 179, 183 (C.A. 6).

"Where, however, the nature or extent of the employing enterprise, or the work of the employees, is substantially changed, the transfer *of a part*, or even all, of the physical assets does not carry along with it the duty of the former owner to continue bargaining with the former exclusive representative. Herman Lowenstein, 75 NLRB 377; Sewell Mfg. Co., 72 NLRB 85; Tampa Transit Lines, 71 NLRB 742. The purchaser in such a situation is not a successor employer. The controlling fact in each case is therefore whether the employment enterprise substantially or essentially continues under the new ownership as before."

Here the operations formerly conducted by Aluminum became a part of those long previously conducted by Flagpole, solely, so far as the record shows, for the purpose of fulfilling certain of Aluminum's commitments. N.L.R.B. v. Alamo White Truck Service, Inc., 273 F.2d 238 (5 Cir. 1959), held that, under the circumstances there presented, the change

---

3. The Board, on August 16, 1961, denied a motion of the Carpenters to "clarify" its order to that effect.

in status from a branch of a nation-wide corporation to an independently owned business was sufficient to excuse the new business from having to bargain with the representative certified for the identical physical unit of the old; the absorption of a new and smaller business into an older and larger one would seem to stand on no different ground when the absorbed business is simply being carried on until some of its contracts are fulfilled. This is especially so when, as here, the assimilating business has its own labor contract. Here, just as much as in the Alamo case, there has been a "distinct change in the employer-employee relationship."

■ We see no reason for reaching a different result because the Johnsons had owned 51% of the stock of Aluminum and were officers and directors, and because they and Flagpole had aided Aluminum in various ways; such continuity of ownership is not decisive when the business of the absorbed entity no longer exists in any clearly identifiable form. None of the lines of authority relied on by the Board is pertinent. This was not a case of mere change in ownership of a business which, save for that change, was continuing substantially as before, such as Rapid Bindery, supra; N.L.R.B. v. Colten, 105 F.2d 179 (6 Cir. 1939); N.L.R.B. v. Adel Clay Products Co., 134 F.2d 342 (8 Cir. 1943); N.L.R.B. v. Blair Quarries, Inc., 152 F.2d 25 (4 Cir. 1945); N.L.R.B. v. Armato, 199 F.2d 800 (7 Cir. 1952); N.L.R.B. v. Lunder Shoe Corp., 211 F.2d 284 (1 Cir. 1954); and N.L.R.B. v. Auto Ventshade, Inc., 276 F.2d 303 (5 Cir. 1960). Neither was this a case where, at the time the unfair labor practice occurred, the two operations were so interrelated that it was impossible to distinguish them, as in N.L.R.B. v. Federal Engineering Co., 153 F.2d 233 (6 Cir. 1946)—an issue that would have been posed if the Board had designated the two East Setauket operations as a single bargaining unit from the outset. Quite plainly it was not a case of attempted evasion by transfer as in Southport Petroleum Co. v. N.L.R.B., 315 U.S. 100, 62 S.Ct. 452, 86 L.Ed. 718 (1942), and N.L.R.B. v. O'Keefe & Merritt Mfg. Co., 178 F.2d 445 (9 Cir. 1949). Closer to the point but not close enough are cases where a parent or affiliate controlling another company's labor policies has been held for participating in or directing various unfair labor practices affecting the subservient firm's employees, e. g., N.L.R.B. v. Condenser Corp. of America, 128 F.2d 67 (3 Cir. 1942), N.L.R.B. v. Somerset Classics, Inc., 193 F.2d 613 (2 Cir.), cert. denied, Modern Mfg. Co. v. N.L.R.B., 344 U.S. 816, 73 S. Ct. 10, 97 L.Ed. 635 (1952). Any order to the controlling company with respect to bargaining in those cases, see also N.L.R.B. v. Swift & Co., 127 F.2d 30 (6 Cir. 1942), was one directing it to cause the other firm, whose business was continuing, to bargain with that firm's own employees, and enjoining the controlling company from interfering with that process; the controlling company was in no instance forced to recognize the certified union as representing employees now its own. Indeed, even in Rapid Bindery, where we upheld the finding "that Frontier was the alter ego of Rapid," 293 F.2d at 171, we struck out "the portion of the order that requires respondent Frontier to recognize Union as the exclusive bargaining representative at the Frontier plant in Tonawanda * * * inasmuch as Union does not appear to represent any of the employees in the Tonawanda plant." No different result is warranted here simply because Flagpole took over five persons employed by Aluminum in July, 1959, incident to its winding-up of Aluminum's contracts— whether they had been employed in March does not appear. A "finding" that one company is the "alter ego" of another is a conclusion of law, not entitled to the benefit of § 10(e) of the National Labor Relations Act, 29 U.S.C.A. § 160(e). The circumstances here, including the important one that Flagpole has its own long-standing labor agreement, effective as to the East Setauket plant, deprive such a finding of legal basis. To require a labor agreement with one union for

some of the 7 employees in this little plant and an agreement with a different union for the others would scarcely forward industrial peace. See N.L.R.B. v. Appleton Electric Co., 296 F.2d 202 (7 Cir. 1961).

Enforcement granted as to Aluminum, denied as to Flagpole.

CLARK, Circuit Judge (dissenting in part).

I cannot agree with my brothers' refusal to enforce this order against Flagpole. The trial examiner found that Flagpole was the *alter ego* of Aluminum; that is, in effect, that they are the same employer and thus the obligations which the National Labor Relations Act places on Aluminum must be borne by Flagpole. In this finding the Board concurred. The courts have recognized several crucial factors which, if found, justify such a finding of fact. Among these are (1) common ownership and control; (2) integration of operations or similarity of activity; and, in some cases, (3) use of common premises. See N.L.R.B. v. Somerset Classics, Inc., 2 Cir., 193 F.2d 613, certiorari denied Modern Mfg. Co. v. N. L.R.B., 344 U.S. 816, 73 S.Ct. 10, 97 L.Ed. 635; N.L.R.B. v. Federal Engineering Co., 6 Cir., 153 F.2d 233; N.L.R.B. v. Condenser Corp. of America, 3 Cir., 128 F.2d 67; N.L.R.B. v. Jones Sausage Co., 4 Cir., 257 F.2d 878. Here these factors were all present, and I see no reason to upset these findings. Since they are facts well supported by substantial evidence, they should be held conclusive on review, as the statute directs, 29 U.S.C. § 160(e).

I do not read N.L.R.B. v. Rapid Bindery, Inc., 2 Cir., 293 F.2d 170, as precluding the action the Board is here requesting. It is true that in that case we refused to order Frontier, which had been held to be the *alter ego* of Rapid, to recognize the union as exclusive bargaining agent at the Frontier plant in Tonawanda. But there all the employees at the Tonawanda plant were newly hired and had never voted for the union, while here some of the employees now working for Flagpole were in the bargaining unit at Aluminum and voted for the union originally. This would seem to require us to reach the opposite result here. The suggestion made by my brothers that we do not know whether the transferred employees were the same men who voted for the Carpenters is irrelevant, for a majority of the unit had selected the union as their representative. Flagpole should be ordered to recognize the union as exclusive bargaining agent of all the former members of the Aluminum unit now in its employ.