330 F.2d 603
 MAJESTIC MOLDED PRODUCTS, INC. and Lucky Wish Products,
Inc., Petitioners,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
METAL, PLASTICS, MISCELLANEOUS SALES, NOVELTY AND PRODUCTION
WORKERS LOCAL 222, INTERNATIONAL PRODUCTION,
SERVICE AND SALES EMPLOYEES UNION, Respondent.
 Nos. 286, 287, Dockets 28408, 28439.
 United States Court of Appeals Second Circuit.
 Argued Feb. 14, 1964.
Decided April 2, 1964.
 
 Samuel Becker, New York City, for petitioners, Majestic Molded Products, Inc., and Lucky Wish Products, Inc. (Murray Frank, Brooklyn, N.Y., for respondent Local 222, on brief) (Josef P. Sirefman, New York City, of counsel).
 Anthony J. Obadal, Washington, D.C. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Elliott Moore, Washington, D.C., Atty.), for National Labor Relations Board.
 Before LUMBARD, Chief Judge, and WATERMAN and FRIENDLY, Circuit judges.
 FRIENDLY, Circuit Judge.
 
 
 1
 This petition to review an order of the National Labor Relations Board, 143 NLRB No. 22, by Majestic Molded Products, Inc. and Lucky Wish Products, Inc. (sometimes hereafter 'the employer'), which were considered by the Board to constitute a single integrated business enterprise, and the Board's cross-petition for enforcement against the employer and Metal, Plastics, Miscellaneous Sales, Novelty and Production Workers Local 222, raise, in the main, questions as to the sufficiency of the evidence to support findings of unfair labor practices by the employer and Local 222 in resisting efforts of Local 107, International Ladies' Garment Workers Union, to organize employees of Lucky Wish in the summer of 1962. Counsel for the employer has commendably narrowed the issue by conceding the sufficiency of the evidence to show favoritism to Local 222 in violation of 8(a)(1) of the National Labor Relations Act, 29 U.S.C. 158(a)(1); his attacks relate to the conclusions as to discriminatory discharges held to violate 8(a)(3) and (b)(2), as to denial of equal electioneering privileges held to violate 8(a)(1), and as to Majestic and Lucky Wish constituting a single integrated enterprise.
 
 
 2
 Henry Wish is president and treasurer of both companies; he and his wife own all the stock of Majestic and, along with their son Richard, 85% Of the stock of Lucky Wish. Majestic manufactures plastic parts and related products which it sells to other manufacturers, including Lucky Wish, a smaller enterprise acquired from third parties, which assembles and jobs plastic consumer items. The operations of the two companies are conducted in the same plant, separated by a wire screen but sharing certain common facilities. Each had a collective bargaining agreement with Local 222, Majestic's expiring on August 1, and Lucky Wish's on September 1, 1962.
 
 
 3
 On June 7, 1962, Local 107 filed a petition seeking an election to designate a bargaining unit for the whole plant. This, as the Regional Director subsequently held, was too late with respect to Majestic under the rule establishing 'a 60-day insulated period' formulated in DeLuxe Metal Furniture Co., 121 NLRB 995, 1000 (1958), and adhered to in Leonard Wholesale Meats, Inc., 136 NLRB 1000, 1001 (1962), but was timely as to Lucky Wish. Early in July, Henry Wish interrogated Karangis, a Lucky Wish employee, in a manner showing hostility to Local 107. Several Lucky Wish employees appeared at a Board hearing on July 5 with respect to Local 107's election petition, and two of them, Goodman and Karangis, testified. On July 9, vLadmer, head of Local 222, came out to the plant, told one Lucky Wish employee he had informed Wish of her participation at the hearing on behalf of Local 107, and warned the employees that the shop could not be run with two unions in it. Displays of hostility to Local 107 by Wish followed, the most significant being a statement to three Lucky Wish employees that he had to know whether or not they would 'stick by Local 222' since 'the factory couldn't run with two unions in it,' and 'he had plans and he had to know exactly what to do for the future.'[1] After an unsuccessful meeting with Lucky Wish employees, Ladmer told them that he would advise Wish to close down the Lucky Wish shop and that Majestic could do their work. The next day eight Lucky Wish employees out of the working force of 15 to 17 were laid off; five more succumbed on July 12. Some were later recalled, the payroll increasing from five during the week ended July 28 to twelve during the week ended August 11. On August 14, Ladmer called the Lucky Wish employees to a meeting in Wish's office, where he admitted being 'the one that told Mr. Wish to lay you girls off.' A few days later eleven employees signed a paper circulated by Ladmer dissociating themselves from the charge that Local 107 had filed. At the time of the hearing in December, Lucky Wish had seven employees.
 
 
 4
 The employer contends the lay-offs were due to a decline in the business of Lucky Wish, which had led Wish, his son and his plant manager as early as April or May to decide on a prospective curtailment. It cites figures showing that after peak sales in May and June, 1962, these decreased from July through November (although sales for the later month were somewhat greater than in the corresponding months of 1961 when more than twice as many people were employed), and stresses that the lay-offs and recalls were in order of seniority, regardless of any union preference known to the employer. It challenges particularly the weight given by the Trial Examiner to the increase in Majestic's work force from 92 in the week ended July 7 to 129 in the following week and more thereafter, and Majestic's failure to hire the employees laid off by Lucky Wish; it claims there was no evidence that Majestic undertook work theretofore performed by Lucky Wish and there was evidence that Majestic's work required greater skills. We doubt that these last criticisms are sustainable. The synchronization was sufficiently suggestive to cast on the employer a burden of explanation which the Board could permissibly conclude was not sustained by oral testimony alone, and the Board was not required to accept Wish's testimony, unsupported by job specifications, that all of Majestic's rather low-paid work required skills not possessed by the workers of Lucky Wish. In any event, the evidence as to what was said on July 9, see particularly fn. 1, what was done on July 10 and 12, and what was said and done in mid-August, was ample to support an inference that Wish ordered the large lay-offs not for the business reason now alleged but to punish the employees of Lucky Wish for the flirtation some of them were having with Local 107 and to make them 'good little girls,' as Ladmer urged them to be on August 14.
 
 
 5
 The employer says this is not enough to warrant a holding of violations of 8(a)(3) and (b)(2) in the absence of evidence that the lay-offs were directed against those employees known to be engaged in the flirtation with Local 107. It presses upon us statements that 'Knowledge by an employer of the discharged employees' union activities is a vital element in the proof of a violation of Section 8(a)(3).' N.L.R.B. v. Atlanta Coca-Cola Bottling Co., 293 F.2d 300, 309 (5 Cir.), rehearing denied, 296 F.2d 896 (1961); see also NLRB v. Moore Dry Kiln Co., 320 F.2d 30 (5 Cir. 1963); Skyline Homes, Inc. v. NLRB, 323 F.2d 642, 645 (5 Cir. 1963), cert. denied, 84 S.Ct. 662 (1964). Appropriate as these remarks may have been to the cases in hand, they do not lacking proof of the employer's knowledge give them. It is true enough that evidence of an employer's awareness of employees' union sympathies will often be crucial to a finding that lay-offs were in fact discriminatory. Thus, in Atlanta Coca-Cola and Moore Dry Kiln, the evidence of legitimate economic justification for the lay-offs was so persuasive that, lacking proof of thze employer's knowledge of the workmen's sympathies, the court held the Board to have failed in carrying its burden. And in Skyline Homes, the proof was so sparse that 'speculation' as to possibly discriminatory motivation did not rise 'above the level of conjecture.' But there would be no warrant for laying down a rule of law forbidding a finding of violation without proof of the employer's awareness of the opinions of the individual employees. A power display in the form of a mass lay-off, where it is demonstrated that a significant motive and a desired effect were to 'discourage membership in any labor organization,' satisfies the requirements of 8(a)(3) to the letter even if some white sheep suffer along with the black. Numerous cases in this and other circuits implicitly hold such action to violate 8(a)(3). See, e.g., NLRB v. Cape County Milling Co., 140 F.2d 543 (8 Cir. 1944); NLRB v. Missouri Transit Co., 250 F.2d 261 (8 Cir. 1957); NLRB v. Brown-Dunkin Co., 287 F.2d 17 (10 Cir. 1961); NLRB v. Goya Foods, Inc., 303 F.2d 442 (2 Cir.), cert. denied, 371 U.S. 911, 83 S.Ct. 256, 9 L.Ed.2d 171 (1962); NLRB v. Savoy Laundry Inc., 327 F.2d 370 (2 Cir. 1964). We must not forget the controlling statements in Radio Officers Union v. NLRB, 347 U.S. 17, 51-52, 74 S.Ct. 323, 98 L.Ed. 455 (1954), that 'encouragement of union membership is obviously a natural and foreseeable consequence of any employer discrimination at the request of a union,' and in NLRB v. Erie Resistor Corp., 373 U.S. 221, 227, 83 S.Ct. 1139, 10 L.Ed.2d 308 (1963), that 'When specific evidence of a subjective intent to discriminate or to encourage or discourage union membership is shown, and found, many otherwise innocent or ambiguous actions which are normally incident to the conduct of a business may, without more, be converted into unfair labor practices.' See also NLRB v. Wallick,198 F.2d 477 (3 Cir. 1952); NLRB v. Norma Mining Co., 206 F.2d 38, 41-42 (4 Cir. 1953).
 
 
 6
 The objection to the portion of the order requiring the grant of electioneering rights to Local 107 rests primarily on the ground, alleged to be supported by Gem International, Inc. v. NLRB, 321 F.2d 626 (8 Cir. 1963), that the employer did no more than fail to answer two letters from an organizer who was not an employee. In these letters, one written on August 28 and the other on September 11, Local 107 demanded 'an opportunity to enter upon your premises and address your employees on the same basis and with equal rights as afforded Local 222,' whose leader had been allowed to solicit the employees on the premises on July 9 and August 14. But the Gem case holds only that a definite request must be made; here it was. As to respondents' emphasis on the suggestion in Gem that organization rights are for the benefit of the employees and not outside organizers, it is sufficient that here the employer was well aware of employee support for Local 107. Under the circumstances Lucky Wish's failure to answer the requests was a denial of equal access, and Local 107 was not obliged to take the futile further step of presenting itself at the plant.
 
 
 7
 The final point requiring discussion is the objection to the order's running against Majestic as well as Lucky Wish. This has practical importance since if only Lucky Wish were involved, the back pay to be awarded in compliance proceedings could not exceed what the employees would have earned if Lucky Wish had pursued its business in a normal fashion, NLRB v. New York Merchandise Co., 134 F.2d 949 (2 Cir. 1943), NLRB v. Ellis and Watts Prod., Inc., 297 F.2d 576 (6 Cir. 1962), whereas under the order as written the employment opportunities at Majestic may also be considered. The employer relies on NLRB v. Aluminum Tubular Corp., 299 F.2d 595 (2 Cir. 1962), where we declined to enforce an order holding two corporations under common control to be a single integrated enterprise. Under that decision the evidence here as to identity of control, the sharing of a few facilities and some interchange of employees (primarily Majestic employees working at Lucky Wish), if it stood alone, might indeed not have sufficed to warrant the Board's action. But there was proof of a more significant relationship which brings this case within a line of decisions we distinguished in Aluminum Tubular, 299 F.2d at 599, 'where a parent or affiliate controlling another company's labor policies has been held for participating in or directing various unfair labor practices affecting the subservient firm's employees,' e.g., NLRB v. Condenser Corp. of America, 128 F.2d 67 (3 Cir. 1942); NLRB v. Somerset Classics, Inc., 193 F.2d 613 (2 Cir.), cert. denied sub nom. Modern Mfg. Co. v. NLRB, 344 U.S. 816, 73 S.Ct. 10, 97 L.Ed. 635 (1952). See also NLRB v. Gibraltar Industries, Ltd., 307 F.2d 428 (4 Cir. 1962), cert. denied, 372 U.S. 911, 83 S.Ct. 724, 9 L.Ed.2d 719 (1963). It was here shown that the two affiliated companies had adopted a common policy and front for labor matters designed to serve joint rather than separate interests. Cf. NLRB v. National Shoes, Inc., 208 F.2d 688, 691 (2 Cir. 1953). The antagonism at Lucky Wish to the organization efforts of Local 107 was directly related to Local 222's position at Majestic, as shown by Wish's statements that 'the factory' or 'the shop' couldn't or wouldn't run with two unions, and by Ladmer's threat 'that he wouldn't stop Mr. Wish from closing (Lucky Wish) and having Majestic do our work.' The lay-off could well have been intended as a lesson not only to the employees of Lucky Wish but to those of Majestic; since Majestic was thus to be a beneficiary of the unfair labor practice, it may properly be required to share in the penalty. Further, the Board had grounds for concluding that Majestic was utilized to perform some of Lucky Wish's work after the lay-off and that the refusal to hire the laid-off employees at Majestic was part of the plan to encourage membership in Local 222 and discourage it in Local 107 at Lucky Wish. If, as is argued, the laid-off employees were not qualified to do certain types of work available at Majestic, that can be shown in the compliance proceedings.
 
 
 8
 The petition for review is denied and the cross-petition for enforcement is granted.
 
 
 
 [1]
 Another employee described Wish as having said 'That he had a few items that were in the making, but he would do nothing about it until this was resolved, because the shop wouldn't run with two unions.'