307 F.2d 428
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
GIBRALTAR INDUSTRIES, INC., and International Trailer
Company, Inc., includingFrank Sachs, Receiver of
International Trailer Company, Inc., Respondents.
 No. 8548.
 United States Court of Appeals Fourth Circuit.
 Argued May 30, 1962.
Decided Aug. 23, 1962.
 
 Melvin J. Welles, Atty., National Labor Relations Board (Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Asst. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Gary S. Green, Atty., National Labor Relations Board, on the brief), for petitioner.
 Howard DeMuth, Jr., Baltimore, Md. (George E. Brown, Jr., Baltimore, Md., on the brief), for respondents.
 Before SOBELOFF, Chief Judge, and SOPER and BOREMAN, Circuit Judges.
 BOREMAN, Circuit Judge.
 
 
 1
 The National Labor Relations Board, in accord with section 10(e) of the National Labor Relations Act, 61 Stat. 136, 147 (1947), as amended, 29 U.S.C.A. 160(e) (1961 Supp.), petitions the court for enforcement of its order of October 30, 1961, issued against International Trailer Company, Inc., and Gibraltar Industries, Inc., as joint employers. It is conceded that International engaged in certain unfair labor practices, including the discharge of several employees because of their union activities. The sole issue here is whether the Board properly found that Gibraltar Industries, Inc., was a joint employer with International of the affected employees and thus jointly subject to the remedial portion of the Board's order.
 
 
 2
 Though there is no substantial dispute as to the evidentiary facts, Gibraltar challenges some of the Board's inferences and the ultimate conclusion drawn from those facts. International, wholly owned by its president, James Fyle, had been engaged for several years in the manufacture of mobile homes and commercial trailers at its plant in Baltimore, Maryland. At the time of the hearing in January 1961, International was insolvent and in receivership in a state court. On December 2, 1960, International ceased doing business and a few days thereafter all former International employees went to work for Gibraltar doing exactly the same work they had done for International.
 
 
 3
 In December 1958 Gibraltar was formed by Charles Frederick Painter and E. B. Jeffress to engage in business as a wholesale mobile-home dealer. James Fyle became Gibraltar's secretary and a holder of two per cent of its stock. On January 1, 1960, Painter bought Jeffress' interest in Gibraltar and thus became the owner of ninety-eight per cent of that corporation's outstanding stock. Shortly after Gibraltar was organized, it executed, with Painter individually and with International, a contract whereby International agreed to sell all the mobile homes it produced to Gibraltar which, in turn, agreed to buy all its mobile homes from International. Painter agreed to provide International with working capital and to indemnify its suppliers. The agreement was subject to termination upon terms and conditions not here relevant; it had not been terminated at the time International went out of business.
 
 
 4
 Apparently because International was so critically short of working capital, it was unable, soon after executing the 1958 agreement, to meet the production quota established therein and Painter was dissatisfied with the workmanship and the quality of the finished products. In early 1959 Gibraltar established offices on International's premises. Painter moved into offices adjoining Fyle's office and a 'Gibraltar' sign was placed over that corporation's office door. Both Painter and Gibraltar began advancing large sums of money to International. In June 1959, Fyle endorsed all his shares of International stock-- the total outstanding issue-- to Painter, who was also given a chattel mortgage on most of International's equipment.[1] A written hypothecation instrument was executed by Fyle with respect to the 'assignment' of the International stock which permitted Painter to sell the shares in accord with the terms of a note to be signed by International as evidence of the loan. The record does not indicate that such a note was ever executed, and Fyle testified that when he turned the stock over to Painter, he relinquished control of International and never expected to have the stock returned to him. Painter testified that he took the stock in addition to a chattel mortgage on International's equipment as security for the loans to International.
 
 
 5
 By June 23, 1959, when the stock 'assignment' was made, Painter had access to all International books and records and, according to Fyle, it was Painter who completely controlled International. But during the ensuing months International's financial condition became worse despite Painter's aid. In October 1959 International's bank refused to permit Fyle to draw any more checks on the corporation's account. For a few months International was permitted to retain a checking account with Painter as a guarantor, but after February 1960 International's account was discontinued entirely; thereafter the company had no bank account.
 
 
 6
 Although the 1958 agreement required only Painter's personal indemnification of International's suppliers, Gibraltar began in early 1960 (right after the closing of International's bank account) to pay the suppliers directly, taking credit for such amounts against future delivery of mobile homes. Eventually purchases of materials for the use of International were made directly on Gibraltar purchase orders. Painter, in February 1960, began advancing cash to meet International's weekly payroll and this procedure continued through the remaining months that International was in business. Other funds were advanced to pay for all insurance carried by International, including workmen's compensation insurance for all the corporation's employees. In the early summer of 1960, when International's credit had become suspect among dealers and suppliers, the 'International' sign was removed and a 'Gibraltar' sign was installed over the door of International's offices. Also, Gibraltar's name, instead of International's, began appearing on the completed mobile homes.
 
 
 7
 Early in 1960, International was about $8000 in arrears in its rent when the owner of the premises demanded a guarantee of payment by a responsible party. Painter assumed liability for the payment of the back rent and advanced funds each month for the current rent. In August 1960 International's lease expired and Gibraltar took it over, retaining the right to terminate it upon sixty days' notice to the landowner.
 
 
 8
 As Painter and Gibraltar gained financial control over International, Painter himself commenced direct participation in the actual operations of International's business. The 1958 agreement authorized Painter to inspect International's inventory and production records and to refuse to guarantee payment of suppliers when in his discretion inventory was in excess of production needs. After Painter became Gibraltar's dominant stockholder in January 1960 he began to make frequent appearances at International's production line, inspecting the work, making suggestions and ordering changes which he thought necessary or desirable. He sometimes appeared at meetings of supervisors and group leaders and in other ways exerted his influence over the details of the production processes.
 
 
 9
 There are several instances where Painter exercised control over International's employees. In June 1959 he decided that the plant superintendent who had worked for International a number of years was not capable and should be replaced. Wayne Stutsman was employed as the new plant superintendent, according to the Board's findings, at the instigation of Painter. At one point Fyle noticed that he, as president of International, was receiving less compensation for his work than was the plant superintendent and decided to give himself a raise of $50 per week. In the discussion that followed, Painter told Fyle that he (Fyle) was not as valuable an employee as the plant superintendent; Fyle did not receive the raise he had intended. International's controller, who had been selected and employed by Painter to guide Fyle's purchasing policies, looked to Painter for a salary increase. Over Fyle's objection, Painter determined that Fyle's former secretary should not be rehired. In the summer of 1960 Painter's personal airplane pilot was made purchasing agent for International though he remained on Gibraltar's payroll. Leroy McDonald, paint foreman for International, testified that he wanted to quit his job but that Painter persuaded him to stay and gave him a raise. Painter further manifested his control over International's affairs by dismissing the purchasing agent employed by International (prior to appointing his pilot for the job) and on another occasion by telling Stutsman to hire a particular boy as a painter.
 
 
 10
 In May 1960 Fyle prepared a classified advertisement seeking craftsmen needed for International's production line. Upon Painter's order, however, the advertising copy was changed by substituting Gibraltar's name in the text instead of that of International.
 
 
 11
 The Board, upon the basis of the economic relationship between Gibraltar and International, the control Gibraltar exercised over the employees of International, and the active participation of Painter in the unfair labor practices (which concededly did occur with Painter's knowledge, consent and encouragement), disagreed with the Trial Examiner's finding that Painter's conduct 'merely displayed a creditor's concern.' The Board reversed the Examiner's amendment of the complaint by which he had eliminated the allegatiin that International's employees were also employees of Gibraltar. It found Gibraltar and International to be joint employers.[2]
 
 
 12
 We are of the opinion that there is substantial evidence in the record to support the Board's conclusion and order imposing joint and several liability on both corporations for the unfair labor practices found. Gibraltar contends that it and International are separate legal entities and that since the unfair labor practices were against International employees by the management of International, it (Gibraltar) should not be jointly liable for the remedial portion of the Board's order. It is also urged that Gibraltar was not a joint employer of the affected employees because (1) neither Gibraltar nor its principal stockholder, Painter, owned any stock in International; (2) Painter was not an officer or director of International; (3) each corporation maintained separate offices though in the same building; (4) each corporation kept its own books and records; (5) Gibraltar paid rent to International; (6) each corporation had its own employees; (7) the two corporations had a contractual arrangement under which each operated with respect to the other; (8) all funds advanced by Gibraltar to International were charged against the future delivery of trailers to be built; (9) Painter and Gibraltar were not the only creditors of International in substantial amounts; and (10) the concern and interest manifested by Painter and Gibraltar in International's work product was only that of any purchaser who was obligated to buy the product for resale. We do not find these arguments persuasive. There is ample evidence in the record showing almost complete control by Gibraltar's president, Painter, of International's affairs. It may well be, § Gibraltar argues, that such control was necessary under the circumstances to protect an investment, but notwithstanding the necessity of such control, it is evident that the employees of International from its president down were de facto employees of Gibraltar at the time the unfair labor practices here involved occurred. Where necessary to safeguard statutory rights, the Board may view separate legal entites as a single employing enterprise. See N.L.R.B. v. Jones Sausage Co., 257 F.2d 878 (4th Cir. 1958); N.L.R.B. v. Williams, 195 F.2d 669 (4th Cir.), cert. denied, 344 U.S. 834, 73 S.Ct. 42, 97 L.Ed. 649 (1952). In Williams, the court, considering two closely-related businesses as constituting an appropriate single bargaining unit, stated that the test for determination of that issue is whefther there are present unity of interest, common control, dependent operation, sameness in character of work and unity of labor relatiions between the separate entites involved. We approve the application of the same test in deciding the issue in the case at bar and reach the conclusion that Gibraltar was properly found to be a joint employer with International. The Board is entitled to consider de facto control in ordering remedial action by a party exercising such control in a manner which violates the National Labor Relations Act. See N.L.R.B. v. Dayton Coal & Iron Corp., 208 F.2d 394 (6th Cir. 1953).
 
 
 13
 Enforcement granted.
 
 
 
 [1]
 In November 1960, about a week after the complaint was issued in the instant case, Painter began foreclosure proceedings. The following month Painter bought at public auction all the items covered in the mortgage, which constituted virtually everything International owned
 
 
 [2]
 The Supreme Court in Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 496-497, 497, 71 S.Ct. 456, 95 L.Ed. 456 (1951), made it perfectly clear that slavish deference by the Board to the Examiner's decision is not required. In the instant case the Examiner found James Fyle a biased witness and placed little confidence in his testimony. The Board's findings do not depend to any substantial extent on Fyle's credibility, however. In reviewing the whole record, we have examined and considered the Trial Examiner's Intermediate Report, but in our opinion the Board was justified in rejecting part of that Report and the Examiner's recommendation with respect to the amendment of the complaint